UNITED STATES DISTRICT

COURT OF ARIZONA

Arcade Entertainment, LLC,         )
                                   )
            Plaintiff,             )
                                   )
      vs.                          ) No. CV 2014-003380
                                   )
AGCS Marine Insurance Company,     )
                                   )
            Defendant.             )
_____)

DEPOSITION OF ALEX CALLAN

Phoenix, Arizona
October 23, 2014
9:16 a.m.

PREPARED BY:

Rosina Seymour, RPR
Certified Reporter
Certificate No. 50212

SEYMOUR REPORTING SERVICES
Registered Reporting Firm R1000
137 East Elliot Road, #2473
Gilbert, Arizona  85299
(P)602.258.5800
(F)888.881.5440

**Page 1**

```
                UNITED STATES DISTRICT
                   COURT OF ARIZONA

Arcade Entertainment, LLC,    )
                              )
              Plaintiff,      )
                              )
        vs.                   ) No. CV 2014-003380
                              )
AGCS Marine Insurance Company,)
                              )
              Defendant.      )
_____)


            DEPOSITION OF ALEX CALLAN

                 Phoenix, Arizona
                 October 23, 2014
                    9:16 a.m.
```

```
                         SEYMOUR REPORTING SERVICES
PREPARED BY:             Registered Reporting Firm R1000
                         137 East Elliot Road, #2473
Rosina Seymour, RPR      Gilbert, Arizona  85299
Certified Reporter          (P) 602.258.5800
Certificate No. 50212       (F) 888.881.5440
```

**Page 2**

                    INDEX

WITNESS                                          PAGE

ALEX CALLAN

    Examination by Ms. Golightly                  4


EXHIBIT         DESCRIPTION                      PAGE

1    Handwritten Claim Filed with AGCS            9
     (5 pages)

2    TSSA Self-Service Storage Rental            13
     Agreement (AGCS000241 - AGCS000245)

3    List of Locations for Machines              34
     (AGCS000212 - AGCS000213)

**Page 3**

            DEPOSITION OF ALEX CALLAN,
taken at 9:16 a.m., on October 23, 2014, at the law
offices of Jones, Skelton & Hochuli, P.L.C., 2901 North
Central Avenue, Suite 800, Phoenix, Arizona, before
ROSINA SEYMOUR, RPR, Certified Reporter No. 50212, in
and for the State of Arizona.

APPEARANCES:

        For the Plaintiff:
            Strojnik, P.C.
            by PETER STROJNIK, ESQ.
            2415 East Camelback Road, Suite 700
            Phoenix, Arizona 85016

        For the Defendant:
            Jones, Skelton & Hochuli, P.L.C.
            by CHELSEY M. GOLIGHTLY, ESQ.
            2901 North Central Avenue, Suite 800
            Phoenix, Arizona  85012

**Page 4**

                ALEX CALLAN,
called as a witness herein, having been first duly
sworn, was examined and testified as follows:


                EXAMINATION
BY MS. GOLIGHTLY:
    Q.  Good morning, Alex.
    A.  Good morning.
    Q.  Can you please state your name for the record.
    A.  Alex Callan.
    Q.  And the last name is C-a-l-l-a-n; is that correct?
    A.  Correct.
    Q.  My name is Chelsey. I met you a minute ago. I represent AGCS Marine Insurance, and we're here to talk about the claim that you made on behalf of Arcade Entertainment. Is that your understanding?
    A.  Yes.
    Q.  Have you been deposed before?
    A.  Yes.
    Q.  How many times?
    A.  Once.
    Q.  I'm just going to go over some ground rules with you then.

Page 5

1  As you can see, Rosina is here taking
2  down everything that we say. Because of that, it's a
3  lot easier for her if we don't talk over one another.
4  In conversation we can sometimes anticipate questions,
5  and answer things halfway through. It screws up the
6  transcript. Basically, we want to wait until each
7  other is finished talking. I'll do the same for you.
8  I tend to be bad at it, just so you know, so,
9  hopefully, we can get through that one.
10        You understand that you're under oath
11 today; correct?
12 A.  Yes.
13 Q.  You're going to answer all the questions
14 truthfully?
15 A.  Yes.
16 Q.  Is there any medications or anything that
17 you're on that would prevent you from doing so?
18 A.  No.
19 Q.  From time to time, you might hear objections
20 to "form" or otherwise. Unless you're directed not to
21 answer the question, you have to answer the question.
22 Okay?
23 A.  Yes.
24 Q.  And the other one, which you're doing a good
25 job of so far, is you have to give audible responses.

Page 6

1  Sometimes we say "m'hum" and "huh-uh" to answer
2  questions, and it's not clear for the record. So we
3  have to say yes or no. Okay?
4  A.  Yes.
5  Q.  Okay. All right. What is your highest level
6  of education, Alex?
7  A.  Some college.
8  Q.  And where did you go to college?
9  A.  Grand Canyon University.
10 Q.  But didn't graduate?
11 A.  Correct.
12 Q.  Are you currently employed?
13 A.  Yes.
14 Q.  With who?
15 A.  Reward Card Solutions.
16 Q.  Okay. And what does Reward Card Solutions do?
17 A.  It is a wholesale provider of prepaid cards.
18 We provide Visa cards, Wal-Mart cards, any kind of card
19 you've seen out on the market, to companies who give
20 them away to their customers and employees as
21 incentives and rewards.
22 Q.  And are you an owner of that company?
23 A.  Yes.
24 Q.  And it's also my understanding that you are an
25 owner in several other LLCs or companies; is that

Page 7

1  correct?
2  A.  Yes. Yes.
3  Q.  Approximately, how many?
4  A.  Six.
5  Q.  Okay. Is one of those companies Arcade
6  Entertainment?
7  A.  Yes.
8  Q.  Okay. And what does Arcade Entertainment do?
9  A.  Arcade Entertainment provides gaming machines
10 that are similar to slot machines, but they have an
11 essence of skill, and they're put out in different
12 locations across Texas, such as gas stations, liquor
13 stores, smoke shops, convenience stores, for people to
14 play.
15        And they pay money to play, and they can
16 win, typically, merchandise within that location.
17 That's it.
18 Q.  Okay. And is that still operational today?
19 A.  No.
20 Q.  Okay. And how long has it -- how long has
21 Arcade not been operational?
22 A.  I think since August of last year.
23 Q.  Okay.
24 A.  I think that's when it was.
25 Q.  So August of 2013?

Page 8

1  A.  I think that's when it was. Yeah, about the
2  time when I filed the claim.
3  Q.  Okay. So the primary business of Arcade was
4  to set up and operate these skilled gaming machines?
5  A.  Correct.
6  Q.  Okay. Do you still have any of the gaming
7  machines in your possession?
8  A.  I do.
9  Q.  How many?
10 A.  I think I have seven.
11 Q.  Okay. And with respect to the claim that you
12 filed in this case, it's for -- what was the claim for
13 that you filed in this particular matter?
14 A.  It was for gaming machines.
15 Q.  Okay. And was it for the theft of them?
16 A.  Yes.
17 Q.  And how many machines were stolen?
18 A.  I think it was 40. I can't recall off the top
19 of my head exactly how many it was.
20 Q.  Okay. I'm going to --
21 A.  It will be there, in the police report.
22 Q.  And the police report, there's more than one;
23 is that correct?
24 A.  Correct.
25 Q.  And how many did you file?

Page 9

1  A. I think I filed two. One with Fort Worth
2  Police Department and one with Arlington Police
3  Department.
4        MS. GOLIGHTLY: Rosina, can you please
5  mark that as Exhibit 1.
6        (Exhibit 1 marked for identification.)
7  Q. BY MS. GOLIGHTLY: Alex, do you recognize that
8  document?
9  A. I do.
10 Q. Is that the handwritten claim that you filed
11 with AGCS?
12 A. It is.
13 Q. For the theft of the machines?
14 A. It is.
15 Q. And attached to Exhibit 1, on the last -- or
16 if you flip to the third page --
17 A. M'hum.
18 Q. -- is that a copy of the police report that
19 you filed with Fort Worth, or one of?
20 A. It is.
21 Q. Okay. And did you file three police reports,
22 total, with Fort Worth Police Department?
23 A. Yes.
24 Q. Okay. And you said you also filed one with
25 the Arlington Police Department; correct?

Page 10

1  A. Yes.
2  Q. When did you file that report?
3  A. I believe it was around either the same day
4  or -- around the same day as this one. (Indicating.)
5  Q. Okay.
6  A. So around 9/18.
7  Q. Well, let's back up for just a second.
8  When -- at some point, you realized the machines had
9  been stolen; correct?
10 A. Correct.
11 Q. And when was that?
12 A. It would have been around 9/18, I suppose, or
13 8/26. The time I was in Texas trying to find the
14 machines.
15 Q. And then you reported them stolen on 9/18 of
16 2013, and that's based on the report --
17 A. Right.
18 Q. -- that we're looking at; correct?
19 A. Right.
20 Q. Why did you wait a couple of weeks to report
21 that?
22 A. Actually, I went back and forth with the
23 Fort Worth Police Department trying to file the report
24 properly. So there was a couple of times where they
25 said I hadn't filed it correctly, and I had to continue

Page 11

1  working on filing it correctly, because I listed
2  multiple locations in the first report, and they said
3  they can't take, you know, multiple locations in one
4  report. They need to be filed separately.
5        And I communicated with them over time
6  and eventually determined the correct way to do it.
7  Q. Okay.
8  A. Also, I was in Texas during some of that time,
9  so I finalized the report when I got back to Arizona.
10 Q. Okay. So you were in Texas on 8/26 of 2013,
11 but you were in Arizona on September 18th?
12 A. I believe so.
13 Q. Okay. And I guess my question is, or what I'm
14 having trouble with, is why we don't have a copy of the
15 police report from Arlington?
16       MR. STROJNIK: Object to the form.
17       Go ahead.
18 Q. BY MS. GOLIGHTLY: You can answer.
19       MR. STROJNIK: Go ahead and answer it if
20 you can.
21 Q. BY MS. GOLIGHTLY: Yeah, you can.
22 A. Okay. I just don't think I received a copy
23 from them in the same way that I received it from
24 Fort Worth, and I didn't include it. I just forgot to
25 include it or didn't request a copy from them.

Page 12

1  Q. So you either forgot to include -- so you
2  either don't have a copy or you didn't request one?
3  A. Yeah.
4  Q. Okay. But you know specifically that you did
5  file a police report with the Arlington Police
6  Department?
7  A. Yes.
8  Q. And what was it for?
9  A. The theft of machines.
10 Q. From what location?
11 A. The storage unit.
12 Q. Okay. And that storage unit, I assume, was
13 located in Arlington?
14 A. Correct.
15 Q. What kind of storage unit was it?
16 A. It was a standard, like, U-Haul-type of
17 storage unit.
18 Q. And do you have a contract for that storage
19 unit?
20 A. I do.
21 Q. And have you produced that to us?
22 A. I have.
23       MS. GOLIGHTLY: Can you please mark that
24 as Exhibit 2?
25       (Exhibit 2 marked for identification.)

13

1  Q.  BY MS. GOLIGHTLY: Alex, have you seen that
2  document before?
3  A.  Yes.
4  Q.  And is this the contract for the storage
5  unit that --
6  A.  Yes.
7  Q.  Just wait until I'm finished, if you can.
8  A.  Sorry.
9  Q.  It's okay.
10     Is this the contract for the storage unit
11  where the gaming machines were stolen from?
12  A.  Yes.
13  Q.  And this is not -- is this a contract for a
14  U-Haul storage unit?
15     MR. STROJNIK: Let me object to the
16  form.
17     But if you can answer, go ahead and
18  answer.
19     THE WITNESS: I can tell you, it's got
20  the name of TSSA at the top.
21  Q.  BY MS. GOLIGHTLY: Okay.
22  A.  So I guess that's the company.
23  Q.  Okay. And it looks like you rented this in
24  September of 2011; is that correct?
25  A.  Yes.

14

1  Q.  Okay. And you had the same storage unit from
2  September of 2011 through August 26th of 2013, when you
3  filed the police report; correct?
4  A.  Yes.
5  Q.  Okay. And you were paying monthly for the
6  storage unit; correct?
7  A.  Yes.
8  Q.  Okay. And how were you paying for the storage
9  unit?
10  A.  I think we paid by check.
11  Q.  Okay.
12  A.  Or credit card. I don't know exactly.
13  Q.  Okay. And do you have records of those
14  payments?
15  A.  Yes.
16  Q.  And that's something that you could produce to
17  us?
18  A.  Yes.
19  Q.  But you haven't yet; is that correct?
20  A.  Correct.
21  Q.  Okay.
22  A.  I don't believe I have.
23  Q.  Okay. And why is that?
24  A.  Because it's been a year, so I don't know if
25  I've produced it yet. It's been a year since we've

15

1  started talking about this.
2  Q.  Do you recall anybody ever asking you for
3  copies of receipts of the storage unit?
4  A.  I don't recall.
5  Q.  So let's back up a little bit. With respect
6  to the arcade machines, I understand that Reward Card
7  Solutions is where you're employed at now. Arcade
8  Entertainment used to be in the business of placing and
9  operating skilled gaming machines; correct?
10  A.  Correct.
11  Q.  And what made you go to -- my understanding,
12  from what you've said today, is that they're located in
13  Texas?
14  A.  The machines?
15  Q.  Yes.
16  A.  Correct.
17  Q.  And what made you place them in Texas?
18  A.  The laws in Texas were favorable.
19  Q.  It's something that is allowed in Texas?
20  A.  Correct.
21  Q.  And not in Arizona?
22  A.  There are -- they are allowed in Arizona, but
23  the laws are not as favorable, so I can't make as much
24  money here.
25  Q.  Okay. What made you decide to get into this

16

1  business?
2  A.  My -- I have an associated business, Reward
3  Card Solutions, that supplies the merchandise to these
4  types of facilities in Florida. And they do well, and
5  so I decided I wanted to try my hand at it.
6  Q.  And it looked -- based on -- did you start
7  Arcade Entertainment around the same time that you
8  rented the storage unit?
9  A.  I think I started it maybe a year before I
10  rented the storage unit.
11  Q.  Okay. And then why did you rent the storage
12  unit in Texas, initially?
13  A.  Because we needed a staging area to be able to
14  put the machines as we found locations to place them.
15  Q.  Okay. And I'm not going to go back through
16  with you all the retailers and whatnot.
17  A.  Sure.
18  Q.  It's my understanding that you purchased the
19  components for the machines from various different
20  places, and then you built them yourselves; is that
21  correct?
22  A.  Correct.
23  Q.  And then once they were built, you had them
24  shipped to Texas; is that correct?
25  A.  Correct.

**Page 17**

1  Q.  And then who placed -- and then the machines,
2  at some point, were placed in various locations;
3  correct?
4  A.  Correct.
5  Q.  And who placed them in those locations?
6  A.  Initially, I did.
7  Q.  And how many locations did you place them in?
8  A.  Probably 10, 10 locations, about.
9  Q.  Okay.
10 A.  I don't recall the exact number.
11 Q.  And we've already discussed, it's gas stations
12 and convenience stores, liquor stores, things of that
13 nature?
14 A.  Correct.
15 Q.  And when you first went down there and placed
16 them in the stores, who -- how did you end up placing
17 them in those various locations? Did you make contact
18 with the store owners? How did that come about?
19 A.  Yeah. I stopped by the stores and asked them
20 if they wanted to earn some extra money by having these
21 machines there.
22 Q.  Did you have the same kind of profit-sharing
23 agreement with all of the stores or no?
24 A.  Similar. Yes.
25 Q.  What was it?

**Page 18**

1  A.  It was typically somewhere between 80/40 [sic]
2  and 70/30 type of a split, where I keep the lower
3  percentage.
4  Q.  Okay. And is any of that in writing?
5  A.  No.
6  Q.  No? It was just an agreement --
7  A.  Yeah.
8  Q.  -- with whomever you spoke with at the stores?
9  A.  M'hum.
10 Q.  Is that a yes?
11 A.  Yes.
12 Q.  Okay. And after you had the machines placed
13 and up and running, what happened after that?
14      MR. STROJNIK: Object to the form.
15 Q.  BY MS. GOLIGHTLY: Sorry. That was a poor
16 question. After you had the machines placed in Texas
17 and they were up and running, did you return to
18 Arizona?
19 A.  Yes.
20 Q.  And who was supervising the machines or
21 servicing the machines while you were in Arizona?
22 A.  They typically ran autonomously.
23 Q.  Okay.
24 A.  And, initially, I would fly back and forth and
25 service the machines myself. So I would stop by about

**Page 19**

1  every week and service all the machines.
2  Q.  Okay. So once a week you were flying down to
3  Texas and servicing all the machines?
4  A.  Yes.
5  Q.  Okay. That's a lot of reward points?
6  A.  Yes.
7  Q.  And what time frame were you doing that in?
8  A.  What do you mean?
9  Q.  From -- I think you said from, roughly,
10 September 2011, until when were you servicing the
11 machines?
12 A.  I couldn't tell you off the top of my head. I
13 don't know.
14 Q.  Okay. Can you give me a guess? Was it six
15 months?
16 A.  No. It was a few months, maybe three months
17 that I was doing it myself, a short period of time.
18 Q.  And then after that who was servicing the
19 machines, if anyone?
20 A.  Paul Peters.
21 Q.  And who is Paul?
22 A.  Paul is my cousin. And he lives in Texas,
23 near the area that we had our machines out there, and
24 he was -- he was doing the job for me after a short
25 period of time.

**Page 20**

1  Q.  Okay. And what were his typical duties?
2  A.  Just go to the machines, pull the money out,
3  and give the money to the -- whatever money was owed to
4  the owners of the establishments, and make sure that
5  they were working properly.
6  Q.  Okay. And I assume the machines take cash?
7  They take dollar bills?
8  A.  Correct.
9  Q.  And after Paul would pull the money out of the
10 machines and pay the respective store manager, owner,
11 whoever, what would he do with the rest of the money?
12 A.  He would pull the amount of money that I owe
13 him for his services out, and then deposit it into my
14 bank account.
15 Q.  You mean deposit the rest into your bank
16 account?
17 A.  Correct, or he would hold it for me until I
18 showed back up.
19 Q.  When Paul was servicing the machines, are we
20 talking mid -- or the beginning of 2012-ish?
21 A.  Yes.
22 Q.  Okay.
23 A.  I'm unsure about the exact dates, but that
24 could be a fine timeline.
25 Q.  Okay. And how much were you typically making

21

1  per month on those machines at that time?
2  A.  I don't remember off the top of my head, but,
3  you know, a few thousand dollars, maybe 3- or 4- or
4  $5,000.
5  Q.  And what was Paul's pay arrangement?
6  A.  We paid him $500 a week.
7  Q.  Okay.  And do you have any idea of how long
8  Paul serviced the machines?
9  A.  A few months, probably three to four months.
10  Q.  Before I forget, after you filed your claim,
11  do you recall being interviewed by a man named Brent
12  Myers?
13  A.  I do.
14  Q.  And do you remember if that was on or about
15  November 5th of 2013?
16  A.  I don't recall, but that sounds like an
17  appropriate date.
18  Q.  Okay.  And when you spoke with Mr. Myers,
19  would you agree with me that you gave him a true and
20  correct explanation of -- sorry.
21       Do you agree that the statements that you
22  made to Mr. Myers were a true and correct
23  representation of your knowledge at the time?
24  A.  Yes.
25  Q.  And have you had a chance to listen to that

22

1  recorded statement -- I'm sorry.
2       Was that statement recorded, to your
3  knowledge?
4  A.  Yes.
5  Q.  Have you had a chance to review that recorded
6  statement?
7  A.  Yes.
8  Q.  And when did you listen to it?
9  A.  A few days ago, when we received it.
10  Q.  Okay.  And since you have had a chance to
11  review it, is there anything in that statement you
12  don't believe is accurate anymore?
13  A.  Not that I can recall.
14  Q.  Okay.  So back to Paul.  Paul, you said,
15  serviced the machines for a couple of months in 2012.
16  And the monthly intake was approximately anywhere from
17  3- to $5,000?
18  A.  Sure.
19  Q.  And it's my understanding that Paul eventually
20  quit; is that correct?
21  A.  Yes.
22  Q.  And when Paul quit, what did you do?
23  A.  Put an ad on Craigslist to try and find
24  somebody else.
25  Q.  And did somebody respond to that ad?

23

1  A.  Yes.
2  Q.  And who responded to that ad?
3  A.  A bunch of people.  I mean, I don't know all
4  their names, but quite a few people.
5  Q.  Did you end up hiring someone from that ad?
6  A.  Yes.
7  Q.  Who was that?
8  A.  That was Norma Reveles.
9  Q.  Was it just Norma or did you hire anybody
10  else?
11  A.  It was just Norma, but her husband Troy kind
12  of came with the deal.
13  Q.  What do you mean by "came with the deal"?
14  A.  They said they could service the machines; she
15  knew how to -- she was a little more businesslike, and
16  he was a little more labor, and so they said that they
17  could perform the services that I need, you know, kind
18  of as a group.  And I thought that was appropriate to
19  have more than one person there at a time.
20  Q.  Okay.  And what was -- were Norma and --
21  sorry.
22       How did you decide that you were going to
23  hire Norma and Troy over all of these other people that
24  applied?
25  A.  You know, we talked, and they seemed like they

24

1  could do the job.  And they had some experience with
2  the machines already.  Her husband said he worked on
3  them before and knew how to tinker with them.  And they
4  seemed like, you know, nice people.
5  Q.  Okay.
6  A.  That's about it.
7  Q.  Did you ever meet them in person?
8  A.  I did.
9  Q.  And was that prior to hiring them or after?
10  A.  Prior.
11  Q.  Okay.  And did you meet with them in Texas?
12  A.  Correct.
13  Q.  What duties -- so once Norma and Troy were
14  hired, what were their duties with respect to the
15  machines?
16  A.  They were to, basically, just go and collect
17  the funds out of the machines; same thing that Paul
18  did.
19  Q.  Okay.  And at some point, did they move the
20  machines from location to location?
21  A.  They did.
22  Q.  Okay.  And why did they do that?
23  A.  They -- you know, sometimes machines would
24  malfunction, and they didn't have the capabilities to
25  resolve the issue.  So we would have to pull one

25

1  machine out of storage, perhaps, and put it into that
2  location.
3       Or we ran four or five different types of
4  games, and over time a game would stop making as much
5  money because people were bored with it. So they would
6  swap out machines so there was a more fresh game in the
7  location.
8  Q.  Okay. And did they do that with respect to
9  all type of locations that the machines were in?
10 A.  Yes.
11 Q.  And whose decision was it -- what games were
12 in what locations?
13 A.  It was kind of a collective conversation, you
14 know; they provide me with reporting on what games were
15 doing well and what games weren't. And over time, you
16 know, after I said, okay, now switch it out, because
17 it's not doing well, they understood once it hits kind
18 of a lower threshold of income that I would request the
19 games would be changed.
20      So eventually, they started understanding
21 to do that on their own.
22 Q.  Okay. And were those requests done via
23 e-mail, over the phone?
24 A.  Typically by phone.
25 Q.  Typically by phone. And you said after a

26

1  while they would just do it on their own?
2  A.  M'hum.
3  Q.  Is that a yes?
4  A.  Yes. I'm sorry.
5  Q.  It's okay.
6       With respect to the pay arrangement for
7  Norma and Troy, was it the same thing that you had with
8  Paul?
9  A.  Yes.
10 Q.  So it's $500 a week. And how often did Norma
11 and Troy have to report to you?
12 A.  Initially, they reported about once a week.
13 And then over time, you know, they stretched it out to
14 two -- once every other week. And then over time it
15 became about once a month.
16 Q.  Is that because you were making income and you
17 were comfortable with them taking care of the machines?
18 A.  There's a couple of reasons. Reason number
19 one is we started to make less money, you know, so the
20 reports were coming in that there just wasn't a lot of
21 income, and it wasn't as --
22      You know, if we had five machines in a
23 location, and we saw that one machine initially --
24 initially, if we saw one machine wasn't making much
25 money, we'd switch it out.

27

1       As all of the machines started to make
2  less money, they did it in unison, I would say. So the
3  need to communicate about those machines became less
4  and less because there wasn't much to talk about.
5  Q.  Okay.
6  A.  So it just became less reporting altogether.
7  Q.  And so let me make sure I understand you
8  correctly. At the beginning, they were reporting
9  month- -- weekly?
10 A.  Weekly.
11 Q.  Okay. And then it started to taper off once
12 the machines made less money?
13 A.  M'hum. Yes.
14 Q.  And when, approximately, if you have a time
15 frame, when did the machines start to make less money?
16 A.  I couldn't -- I have no idea.
17 Q.  Okay. Around the time that they were stolen,
18 do you recall how much money the machines were making,
19 approximately?
20 A.  Very little. You know, maybe a few hundred
21 dollars a week. I mean, it was very little money.
22 Q.  So from when you initially started the --
23 sorry -- you started placing the machines, and they
24 became operational in these locations, until the time
25 that they were stolen, we're talking about anywhere

28

1  from 3- to $5,000 a month? And is that per machine?
2  A.  No.
3  Q.  Per location?
4  A.  No. That's total.
5  Q.  Oh, okay. For all 40 machines --
6  A.  Yes.
7  Q.  Sorry. I don't think we ever established
8  that. How many machines did you have in circulation in
9  Texas?
10 A.  Total, I think I had about 60 machines, total.
11 Q.  Okay.
12 A.  At any given time we probably had about 40
13 out, 40 out on location is about the right number.
14 Q.  Okay. And the remaining ones would be where?
15 A.  In storage. And those are very approximate
16 numbers.
17 Q.  Yeah. Okay.
18      So eventually the profit went from
19 three -- I'm sorry. We're talking profit, correct,
20 when we're talking about these numbers?
21 A.  I'm talking gross revenue.
22 Q.  So at the beginning in -- sorry.
23      When the machines were placed and became
24 operational, sometime in 2011, until they were stolen
25 in August of 2013, it went from -- the gross revenue

29

1  went from 3- to $5,000 down to a couple hundred dollars
2  total, for all the machines?
3    A.   Yes.
4    Q.   So we're talking just a couple of dollars,
5  maybe, per machine at that point?
6    A.   Yes.
7    Q.   Was that concerning to you?
8    A.   Yes. We had explanations to the scenario
9  though.
10   Q.   What were the explanations?
11   A.   We had a couple of reasons. Reason number one
12 is that the machines that we put out initially were
13 considered to be very desirable machines.
14        And shortly after, maybe about six months
15 after they came out, a new version of all these
16 machines came out. So they were no longer the top --
17 top type of machine. So the desirability for the
18 players went down.
19        Additionally, we also had another company
20 come into the area and start usurping quite a bit of
21 our business. So that -- those two scenarios, coupled
22 together were -- made my business go down dramatically.
23   Q.   Okay. And at some point while the, you know,
24 the business was declining, so to speak, you made a
25 decision to go to Texas; is that correct?

30

1    A.   Yeah.
2    Q.   Had you gone to Texas -- how often did you go
3  to Texas to check on the machines during this two-year
4  period that we're talking about?
5    A.   Initially, I went pretty often, you know, a
6  few times, maybe two times a month. And then it
7  tapered off. Toward the end I was going maybe every
8  three months or something to that effect. It became
9  less and less often over time.
10   Q.   Okay. And when you decided to go down there
11 in August, we've established August 26th, 2013, do you
12 remember when you had been to Texas -- your last visit
13 prior to that occasion?
14   A.   I don't.
15   Q.   No? So once you got to Texas in August, what
16 did you do?
17   A.   I rented a U-Haul and I drove to the storage
18 unit.
19   Q.   Okay. So you didn't -- did you rent the
20 U-Haul from a different location than where your
21 storage unit was?
22   A.   Yes.
23   Q.   And do you -- was the unit that -- the storage
24 unit that you rented at a U-Haul station?
25   A.   I think it's a U-Haul rental station, but it's

31

1  not an actual U-Haul-owned company.
2    Q.   So do they have trucks there that you could
3  have rented?
4    A.   I think that they do.
5    Q.   So why did you rent a U-Haul truck from a
6  different location?
7    A.   Because I flew in to Texas, and I had a taxi
8  drive me to the closest U-Haul station because a taxi
9  is much more expensive than a U-Haul truck.
10   Q.   Okay. And then once you -- was anybody with
11 you at that time?
12   A.   Yes.
13   Q.   Who?
14   A.   One of my employees, Ian.
15   Q.   And when the two of you went and rented the
16 truck, what did you do after that?
17   A.   We went to the storage unit.
18   Q.   Okay. And what did you find at the storage
19 unit?
20   A.   It was primarily empty, other than some, you
21 know, broken pieces and garbage.
22   Q.   And to the best of your recollection, there
23 were approximately 20 units or 20 game machines in
24 there?
25   A.   There should have been.

32

1    Q.   There should have been. Was the storage unit
2  locked when you got to it?
3    A.   It was.
4    Q.   Were there any signs of forced entry?
5    A.   Not that I could tell. No.
6    Q.   Is it locked -- is it sort of like a padlock?
7    A.   Yes.
8    Q.   Who had keys to that padlock?
9    A.   I did, and Norma and Troy did.
10   Q.   Did anyone else?
11   A.   No.
12   Q.   And the padlock -- did the padlock look like
13 it was tampered with at all?
14   A.   I mean, I couldn't tell any -- any differences
15 between when I left it and when I got there.
16   Q.   Okay. And when you -- so you unlocked the
17 storage unit; you opened it up; and you said all the
18 machines are gone; correct?
19   A.   Yes.
20   Q.   And what was your first thought?
21   A.   Initially, I thought they must be out there
22 being used.
23   Q.   Okay. Did you -- so you didn't have any
24 thoughts at that time that they were missing?
25   A.   No reason to have those thoughts. Not really.

33

1  Q.  You just thought that all 60 of the machines
2  were in circulation, as opposed to the usual 40/20
3  split?
4  A.  The 40/20 split, you know, was a circumstance
5  of how many machines could fit in a location or what
6  was being repaired. If everything was going perfectly
7  all the time, we would have all 60 machines out. So,
8  you know, it was odd that there were no machines there
9  to me, but there was no reason to assume the worst.
10 Q.  Did you store anything else in the storage
11 unit, other than the machines?
12 A.  Yeah, tools, spare parts, and things like
13 that.
14 Q.  And were those items in the storage unit?
15 A.  There were spare parts but not my tools.
16 Q.  Did you find it odd that your tools weren't
17 inside?
18 A.  I found it frustrating, but I didn't find it
19 necessarily odd. They had used my tools in the past.
20 Q.  And after you got to the storage unit,
21 realized that it was empty, what did you do after that?
22 A.  Left and went to the closest location that
23 I -- we had machines at.
24 Q.  And what was that?
25 A.  I think it was Oasis -- Oasis mug shop or

34

1  Saveway smoke shop, one of those two.
2       MS. GOLIGHTLY: Would you mark that as
3  Exhibit 3, please?
4       (Exhibit 3 marked for identification.)
5  Q.  BY MS. GOLIGHTLY: Alex, do you recognize that
6  document?
7  A.  I do.
8  Q.  And is that a document that you provided to
9  the investigator when you were interviewed?
10 A.  Yes.
11 Q.  And is it a list of the 10 locations where the
12 machines were operational at some point?
13 A.  Yeah.
14 Q.  Okay. And the first one on, what's labeled
15 AGCS 212 down at the bottom, is Oasis Pipe & Tobacco;
16 correct?
17 A.  Yes.
18 Q.  And if you look at that line it says, "Number
19 of Machines"?
20 A.  M'hum.
21 Q.  And it says five there. Do you have any
22 recollection, of when you arrived at Oasis, how many
23 machines were there?
24 A.  I think that there were five there when I
25 arrived.

35

1  Q.  And where did you go after Oasis?
2  A.  I think I went to Toney's Auto Shop after
3  Oasis, but I don't recall the exact order.
4  Q.  But at some point, you went to Toney's Auto
5  Shop?
6  A.  Yes.
7  Q.  This is all on August 26th of 2013; correct?
8  A.  I believe so.
9  Q.  What did you find at Toney's Auto Shop?
10 A.  No machines.
11 Q.  And how many machines were typically there?
12 A.  Two.
13 Q.  Okay. What was your first thought when you
14 realized there weren't any machines at Toney's?
15     MR. STROJNIK: I'm sorry. Whoops. Where
16 are the machines?
17     THE WITNESS: I mean, what's going on? I
18 don't know.
19 Q.  BY MS. GOLIGHTLY: Did that cause you any
20 concern?
21 A.  Yeah.
22 Q.  What did you do?
23 A.  I asked him where the machines are, and he
24 said that they had been taken by the people that always
25 deal with the machines. And I decided to go around and

36

1  check the other locations.
2  Q.  Okay. When you say "he said," who is "he"?
3  A.  Omar, I believe. Omar.
4  Q.  Is he the owner or --
5  A.  He's the owner's son.
6  Q.  And he told you that the people that normally
7  come around took the machines?
8  A.  Yes.
9  Q.  And who did you understand that to be?
10 A.  Norma and Troy.
11 Q.  Did he tell you when --
12 A.  No.
13 Q.  -- they came by and took the machines?
14 A.  No.
15 Q.  And after Toney's -- you've testified that you
16 went around to your other locations, and what did you
17 discover at your other locations?
18 A.  They -- they didn't have the machines either.
19 Q.  All of them?
20 A.  Yeah.
21 Q.  So --
22 A.  Well, yeah, all of them.
23 Q.  So Arroyo's, Treasure Island, Dos Molino's,
24 Phillips 66, and Gifts and Mo's, none of them had
25 machines in them?

Page 37

1   A.   Correct.
2   Q.   Okay.
3   A.   It's a pretty good name; right?
4   Q.   Yeah. It's great. It's like the Mo Money
5   Pawnshop on Indian School.
6        And if you go to the second page, there's
7   two additional stores listed, or three additional
8   stores listed.
9        No. Sorry. I misspoke. There's
10  several.
11  A.   Yeah.
12  Q.   So did you -- you went by Saveway, and the
13  Shop, and Fiesta y Mas, Texaco Game Room, and H1 Smoke
14  Shop, and there were no machines in any of those
15  locations?
16  A.   Correct. Saveway had been closed already, so
17  I knew there weren't machines there. So I didn't go to
18  Saveway.
19  Q.   So there weren't any machines at Saveway at
20  that time?
21  A.   I don't believe so.
22  Q.   So you went to all of these locations, and
23  there were no machines at any of these locations?
24  A.   Yes.
25  Q.   Okay. And did you talk to the store owners or

Page 38

1   the managers about where the machines went?
2   A.   In the case that the location was open, I did.
3   Q.   And in addition to Saveway, then, what other
4   locations were closed?
5   A.   H1 Smoke Shop, Fiesta y Mas, and I think the
6   Shop, and -- yeah. That's it, H1, the Shop, Fiesta y
7   Mas, and I think Gifts and Mo was also closed.
8   Q.   Okay. And prior to you going to those
9   locations, did you know they were closed?
10  A.   No.
11  Q.   So you thought your machines were in those
12  locations and were operational?
13  A.   Yes.
14  Q.   With respect to the locations where you had
15  machines that were open, did you speak to people at
16  those locations about the machines not being there
17  anymore?
18  A.   Yes.
19  Q.   And who did you speak to, then, at Arroyo's?
20  A.   It was a young man. I don't know his name,
21  actually.
22  Q.   Okay.
23  A.   But he's one of the owner's kids. He's the
24  only one that speaks English.
25  Q.   And what did he tell you?

Page 39

1   A.   He told me the same thing that Tony told me,
2   that the machines had been taken by the people that
3   serviced them, Troy and Norma.
4   Q.   Is that the same thing that happened at Texas
5   Game Room?
6   A.   Say that again.
7   Q.   Sorry. When you went to Texaco Game Room on
8   that day --
9   A.   Yeah.
10  Q.   -- you spoke with someone there about the
11  machines; correct?
12  A.   Yes. Yeah.
13  Q.   And who did you speak with, if you recall?
14  A.   I don't know the guy's name, but he told me
15  the same thing.
16  Q.   Okay. And same thing for -- or H1 Smoke Shop
17  was closed, so I think that's -- so we've got Oasis,
18  Toney's, Arroyo's, and Texaco, that you spoke with
19  people at, and they all told you that Norma and Troy
20  took the machines?
21  A.   Yeah. I think that's correct.
22  Q.   And if you flip back to the first page of
23  Exhibit 3, is that also true for Phillips 66, Dos
24  Molino's and Treasure Island?
25  A.   I think Treasure Island may have been closed,

Page 40

1   actually, too. But Dos Molino's and Phillips 66, yeah.
2   Q.   And then what about this -- there is also a
3   place called Grass Roots listed on here.
4   A.   I don't recall about Grass Roots. I think --
5   it may have been closed as well.
6   Q.   Okay.
7        MR. STROJNIK: Where do you see that?
8        THE WITNESS: First page, second one
9   down.
10       MS. GOLIGHTLY: Yeah. Second.
11       MR. STROJNIK: Oh.
12  Q.   BY MS. GOLIGHTLY: And then there's two
13  addresses listed at the bottom here, on the first page
14  of Exhibit 3, that just say Arcade Entertainment?
15  A.   So the first one is my office here in
16  Phoenix. I had one machine that I used for testing so
17  I could troubleshoot with people.
18  Q.   And that one wasn't stolen; correct?
19  A.   Correct.
20  Q.   Okay.
21  A.   And the second one is my storage unit. It
22  says Arcade Entertainment Storage.
23  Q.   And that's --
24  A.   The location in Arlington.
25  Q.   The location that we have the contract for;

41

1 correct?
2  A.  Yes, ma'am.
3  Q.  And then on the second page of the document,
4 Arcade Entertainment Storage is listed, but there's
5 only two machines. Do you see that?
6  A.  I do.
7  Q.  Can you explain that?
8  A.  It may have been -- this page may have been
9 initially created when we had less machines. So I -- I
10 did two -- two -- basically, two shipments of machines
11 to this area.
12  Q.  Okay.
13  A.  And we did them in chunks of 20 or 40.
14  Q.  And who would have put together the exhibit
15 that we're looking at here?
16  A.  Me.
17  Q.  Okay. So, excuse me, you were keeping track
18 of how many machines were in which locations?
19  A.  Yes.
20  Q.  And is that something that you kept track of
21 the entire time that you were running Arcade
22 Entertainment?
23  A.  It was my responsibility, but I didn't always
24 have a -- you know, I didn't keep perfect track of them
25 all the time.

42

1  Q.  And are there any -- are there any more
2 documents, similar to this one, that you have in your
3 possession?
4  A.  I don't think so.
5  Q.  And are there any documents, similar to this
6 one, that have dates on them?
7  A.  No, not that I know of.
8  Q.  Okay. So --
9  A.  This was a -- this was a running document, so
10 as things would be updated, I would change it.
11  Q.  Is it an Excel spreadsheet?
12  A.  Yes.
13  Q.  All right. So far we've established you went
14 to Oasis Pipe & Tobacco. There's supposed to be five
15 machines there, and there weren't?
16  A.  No. Oasis had five machines there, and I took
17 them.
18  Q.  Oh, you took those?
19  A.  Yeah.
20  Q.  And then did you come across any other
21 locations where there were machines?
22  A.  I don't believe I did.
23  Q.  Okay. So you have -- I'm just trying to do
24 the math for --
25  A.  Sure.

43

1  Q.  -- what we have in front of us.
2       So there's five machines that you took
3 from Oasis. Where did you take them to?
4  A.  Initially, I took them back to the storage
5 unit and put them in there.
6  Q.  Okay. Back to the storage unit. The same
7 storage unit that, when you arrived there earlier that
8 day, was empty?
9  A.  Correct.
10  Q.  And let me back up. When you got to Oasis and
11 you realized the machines were there, you didn't think
12 anything was wrong?
13  A.  The reason I was in Texas was because
14 something was wrong. You know, we weren't making
15 money, so I wanted to get all my machines in my
16 possession again so we could figure things out and I
17 wouldn't lose my assets.
18  Q.  What did you think was wrong?
19  A.  I wasn't making any money, so it was being run
20 improperly. The machines weren't in the right places.
21 They were turned off. We didn't know, but, you know,
22 the mindset was that we -- we knew there was some
23 issue, so the wisest thing is to get all the stuff in
24 your possession again and kind of go from there.
25  Q.  Makes sense. So when you went down there, did

44

1 you tell Norma and Troy that you were coming down
2 there?
3  A.  No.
4  Q.  Why not?
5  A.  I wanted to have control of everything first.
6  Q.  Why?
7  A.  Because I didn't know what the problem was at
8 that point, and so the wisest choice is to get your
9 assets first, before you start kicking up dust.
10  Q.  Okay. Did you have any -- did you suspect
11 that Norma and Troy might be mishandling the machines?
12  A.  I suspected everything, so all of that came
13 into mind. I suspected that, you know, the machines
14 were all broken. I suspected that somebody was
15 stealing money out of my machines at the location. You
16 know, every thought crossed my mind.
17  Q.  Okay. So you get down there and you go to
18 Oasis. Oasis has the machines, and I -- I'm sorry.
19 Did you take them with you as soon as you got to Oasis?
20  A.  Yes.
21  Q.  Okay. And so you put them in the U-Haul truck
22 that you rented; correct?
23  A.  Yes.
24  Q.  Then did you take the U-Haul truck around to
25 all these other locations?

45

1   A.  Yes.
2   Q.  And location-by-location you started to
3   realize that there's no machines at any of them?
4   A.  Yes.
5   Q.  And then what did you do when you realized
6   that there were no machines at the locations where they
7   were supposed to be?
8   A.  I called Norma.
9   Q.  And what did Norma say?
10  A.  She basically said, "I don't have your
11  machines anymore. I'm really sorry. I don't have
12  them."
13  Q.  That was it?
14  A.  Basically, that was it. Yeah.
15  Q.  Did you ask her what happened to the machines?
16  A.  She -- I asked her what happened to the
17  machines, and she said, you know, "I don't have them
18  anymore. I can't get them back for you." That's it.
19      She was very apologetic and very firm
20  about the fact that she couldn't do anything about it.
21  And didn't really have any explanation for it.
22  Q.  Okay. Did you talk to Troy about where the
23  machines were?
24  A.  A little bit.
25  Q.  What did Troy say?

46

1   A.  About the same.
2   Q.  That they just -- they have absolutely no idea
3   where the machines went?
4   A.  I think they had an idea where the machines
5   went, but they didn't want to talk to me about it.
6   Q.  What do you mean by that?
7   A.  I think that they, you know, the machines got
8   broken or the machines got taken from them or they --
9   you know, they put them in the wrong spot, and they
10  didn't know how to tell me.
11  Q.  Okay. What do you mean by "put them in the
12  wrong spot"?
13  A.  Put them in a location where somebody took
14  them or put them in -- you know, left them in a place
15  that somebody took them from or they no longer have
16  access to or something to that respect. You know, I
17  didn't feel like they -- I didn't feel like Norma and
18  Troy were bad people at all. And I just think that
19  they got -- they may have gotten themselves into a
20  scenario that they couldn't get out of. That's why
21  communication stopped. That's why money stopped coming
22  in and why they didn't really have anything to tell me.
23  Q.  At any point, did you suspect that they had
24  something to do with the disappearance of the machines?
25  A.  Obviously. Of course, I would have that

47

1   suspicion, you know, but, like I said, I suspected
2   everything. I mean, the machines were gone.
3   Q.  Okay. Well, once you got -- so after you go
4   to all of these places and the machines are all gone,
5   did you go back to the storage unit?
6   A.  Yes.
7   Q.  And did you drop off the five machines that
8   you got at Oasis?
9   A.  Yes.
10  Q.  In the storage unit that was empty?
11  A.  Initially, I did. And then I got a new
12  storage unit there and, you know, moved it to another
13  one in the same facility so that those wouldn't
14  disappear as well.
15  Q.  Okay. So once you got back to the storage
16  unit, was it your impression that someone had stolen
17  the machines out of the storage unit?
18  A.  Obviously, the machines weren't there, so the
19  answer is yes. But I don't know if they were stolen
20  from the storage unit itself or stolen from another
21  location.
22  Q.  So you didn't have any concerns placing the
23  machines at the same storage location and just
24  switching units?
25  A.  I didn't have any concern about that at all.

48

1   No. There's hundreds of units there. I mean, if
2   somebody wanted the other five machines, they would
3   have to search through, you know, 200 storage units.
4   That's silly.
5   Q.  And I believe you testified earlier that you
6   have seven machines still in your possession?
7   A.  Yeah. I think so.
8   Q.  So there were five at Oasis; there was one
9   that was in your office currently?
10  A.  M'hum.
11  Q.  What's the other machine?
12  A.  I think it was pieced together from the parts
13  at the storage unit.
14  Q.  You think it was or?
15  A.  Yeah. I think it was. Yeah.
16  Q.  Do you -- well, you're the one that builds the
17  machines; correct?
18  A.  Yeah. So it was -- I think that's correct.
19  It was -- you know, there was a cabinet there, and
20  there were spare parts and things like that. So
21  collectively it was seven, either seven or eight. I
22  can't remember off the top of my head.
23  Q.  Well, how many do you have in your possession
24  right now?
25  A.  I don't know. I think it's seven or eight.

**49**

1  They're not sitting in my office. It's been a year
2  since I've had this issue. I haven't touched them.
3  Q.  Are they still in the storage unit in Texas?
4  A.  No. No.
5  Q.  Where are they?
6  A.  Now, they're in Florida.
7  Q.  Where are they in Florida?
8  A.  They're with one of my clients. He's trying
9  to piece them together and use them for one of his
10 locations. They're worthless sitting in my office.
11 Q.  Obviously. Do you know if he has them
12 operating?
13 A.  I don't believe that he does.
14 Q.  But he either has seven or eight of them?
15 A.  Yeah.
16 Q.  Okay. Help me out here. Where did the eighth
17 one come from?
18 A.  I'm just saying that I don't recall the exact
19 number of how many.
20 Q.  Okay.
21 A.  It was a year ago that I was dealing with this
22 so ...
23 Q.  And what's your client's name in Florida?
24 A.  Joe Davis.
25 Q.  And do you have contact information for him?

**50**

1  A.  Sure.
2  Q.  What's his phone number?
3  A.  (772) 201-1392.
4  Q.  Okay.
5       MR. STROJNIK: Pardon me. Too much
6  coffee.
7  Q.  BY MS. GOLIGHTLY: Did you ever talk to the
8  clerk or manager at the storage unit about the machines
9  being missing?
10 A.  No.
11 Q.  And why is that?
12 A.  I don't know that they would be of any help to
13 me.
14 Q.  Okay. But you said that you filed a police
15 report with the Arlington Police Department for the
16 theft of the machines out of the storage unit; correct?
17 A.  Yes. Yes.
18 Q.  So if you believe them to be stolen, why
19 didn't you ask the person that worked at the storage
20 unit, you know, for -- have you seen anybody
21 suspicious, anything like that?
22 A.  Because that's a completely arbitrary question
23 to the guy at the storage unit. I mean, there's
24 hundreds of units there; there's people moving in and
25 out of the location all the time; the lock wasn't

**51**

1  broken; the door wasn't smashed in; their front gate
2  wasn't broken down. So I think that that would be a
3  wasteful thing for me to do, and I'm not an
4  investigator.
5  Q.  Okay.
6  A.  That's not what I do for a living.
7  Q.  Understood. But you obviously thought that
8  the machines were stolen out of the storage unit;
9  correct?
10 A.  I thought that -- that's the last place I saw
11 the machines, so that's the only claim I can make, is
12 that that's where I knew them to be last and they're
13 not there anymore, so yeah.
14 Q.  So you called the Arlington Police Department?
15 A.  Yes.
16 Q.  And you made a police report for stolen
17 machines for the storage unit?
18 A.  Yes.
19 Q.  And was that the same day? Was that August
20 26th of 2013?
21 A.  I think it was about that time. Yeah. It was
22 somewhere around those dates.
23 Q.  And then you also called the Fort Worth police
24 that day too; correct?
25 A.  It's whatever dates were listed there on the

**52**

1  police report.
2  Q.  Well, you might have reported it later --
3  A.  Yeah.
4  Q.  -- but you called the Fort Worth Police
5  Department -- I believe you testified earlier that you
6  called the Fort Worth police department that day to
7  report it, but you didn't properly file --
8  A.  Yes.
9  Q.  -- the police reports; correct?
10 A.  Yes. So I assume that I called the Arlington
11 Police Department around the same day.
12 Q.  If we go back to what's been marked as
13 Exhibit 1. Yeah. That one. And we turn to the third
14 page, there is a brief report for Texaco Gas Station.
15 Do you see that down at the bottom? It's written in
16 the comments.
17 A.  Yes.
18 Q.  It says:
19      5 arcade machines were placed in Texaco
20 as amusement for patrons. They are no longer there,
21 without our permission.
22      Do you see that?
23 A.  Yes.
24 Q.  And then on the next page, in the same
25 location:

53

     22 arcade machines were placed in a H1
Smoke Shop as amusement for patrons. The location
closed down without notification to us and our machines
were not returned.
     MR. STROJNIK: Object to the form.
Q.   BY MS. GOLIGHTLY: Do you see that?
A.   Yes.
     MS. GOLIGHTLY: What's wrong with the form?
     MR. STROJNIK: You said the same location. I think it was a different location.
     MS. GOLIGHTLY: Oh, I meant same location on the page. Sorry.
Q.   BY MS. GOLIGHTLY: Do you see that text on the second page?
A.   Yes.
Q.   And then if you flip to the last page of Exhibit 1, underneath where it says "Narrative," it says:
     2 arcade machines were placed in Toney's Auto Shop as amusement for patrons. They are no longer there, without our permission.
     Do you see that?
A.   Yes.
Q.   Where, then, are the police reports for the

54

other seven locations that the machines were stolen from?
A.   I only did a police report for those three locations.
Q.   And why is that if they were stolen from, at least, seven other locations?
A.   The -- these were the primary locations that I had an issue with, and I didn't think it would make a big difference. Those were the only ones that had the most of my machines there. So is it -- what's the difference between seven of the -- seven police reports, and three police reports for the same issue?
     As I told you before, initially I tried to file one police report saying I had all these machines stolen, and they made me chop it up so ...
Q.   So you're saying you picked the three locations that you thought were the most important?
A.   Yes. You could say that.
Q.   Okay. And what makes them the most important?
A.   I don't know. I couldn't tell you my mindset at the time.
Q.   Okay. So you just arbitrarily decided that you wanted the games from those three locations, even though they were stolen from more than twice those locations -- more than twice the amount of those

55

locations?
A.   I don't know if I would say "arbitrarily," but all I knew was that I needed to break it up. The police report said I needed to break up where they were.
Q.   Okay. So --
A.   Because I -- because I told them that they were stolen from more than one address.
     Maybe I was a little lazy in my police reporting.
Q.   So what you're telling me is that there aren't any police reports for any of the other locations that we've discussed today, aside from Toney's Auto Shop, the Texaco Game Room, the H1 Smoke Shop and --
A.   The storage unit.
Q.   But we don't have that police report; correct?
A.   Yes.
Q.   Okay. And the claim that you're making today, if you look at Exhibit 1, is for $140,500; is that correct?
     MR. STROJNIK: Object to the form.
Q.   BY MS. GOLIGHTLY: It's like Item 36 on Exhibit 1. Do you see that?
A.   Yes.
Q.   Okay. How did you come up with that number?

56

A.   That was the valuation of those machines, times the number of machines.
Q.   So how much are the machines -- are the machines all valued at the same amount each?
A.   More or less. Yeah.
Q.   And what is that amount?
A.   I can do the math for you.
Q.   Yeah. Please do.
A.   We've got how many machines? Was it 20, plus 22, plus five.
Q.   Yeah. So there's 29 machines that we have police reports filed for.
A.   29?
Q.   Yeah.
A.   But I think I made a claim for 47 machines.
Q.   And that's where I don't see that anywhere.
A.   Okay. Yeah, so the other machines that were in the storage unit.
Q.   Okay.
A.   So 140,500 divided by 47 equals about $2,900 a machine, almost 3,000 a machine.
Q.   So you're saying that 47 machines were stolen?
A.   Yeah.
Q.   And when you purchased these machines, how many did you purchase?

57

1   A.   Total, I purchased 60, over time.
2   Q.   Okay. And have you ever purchased any more
3   than those 60?
4   A.   No. No.
5   Q.   Okay. So you made a claim for 47 of them;
6   correct?
7   A.   Yes.
8   Q.   So there should be 13 left?
9   A.   Yes.
10  Q.   Okay.
11  A.   So where are the rest?
12  Q.   Yeah.
13  A.   So over time, some of them broke and were just
14  too far beyond repair, and we threw them away.
15  Q.   Okay.
16       MR. STROJNIK: You guys are too good for
17  me. I've got to take a break. Can we do that?
18       MS. GOLIGHTLY: Yeah, no problem.
19       (Recessed from 10:14 a.m. to 10:21 a.m.)
20  Q.   BY MS. GOLIGHTLY: So with respect to the
21  police reports, you made three of them. And then there
22  is one for Arlington that we don't have. Is that
23  something you think you could get us a copy of?
24  A.   Probably.
25  Q.   And to backtrack a little bit, with respect to

58

1   Norma's operation and when she would service the
2   machines or move them from place to place, how did she
3   do that?
4   A.   What do you mean?
5   Q.   How would she move the machines from location
6   to location?
7   A.   Sometimes she would rent a U-Haul, and
8   sometimes she would use her husband's truck.
9   Q.   Okay. For the times that she would use a
10  U-Haul, would she pay for that or would you pay for
11  that?
12  A.   Typically, I would pay for it.
13  Q.   Do you have receipts for those U-Hauls?
14  A.   I have some. Yes.
15  Q.   And those are things that you could provide to
16  us?
17  A.   I believe I already have, but the answer is
18  yes.
19  Q.   Okay. And when you talked to Norma on the
20  phone, after you realized that the machines were
21  missing, and she was -- she told you that she pretty
22  much couldn't tell you what happened; is that a fair
23  statement?
24  A.   I think that she was embarrassed it, by what
25  happened, and didn't want to talk about it.

59

1   Q.   Did you tell her that because she was the last
2   person in possession and control of those machines,
3   that you were going to have to tell the police about
4   her?
5   A.   I told her that I was going to file a police
6   report and that, you know, if I don't know where -- if
7   I can't be told where the machines are, then that's
8   what I'm going to have to tell them. Yes.
9   Q.   Did you tell the police that?
10  A.   Yeah. It's in the police report.
11  Q.   Where?
12  A.   We hired a servicing contractor, Norma
13  Reveles, to collect our machines, and she stated she
14  does not know where the machines are, and she does not
15  have them.
16  Q.   But you didn't list Norma as a suspect for --
17  A.   I don't think it gives me an opportunity in
18  here to list a suspect.
19  Q.   Did you ever tell the officer that you
20  suspected Norma of stealing the machines?
21  A.   I don't recall. I mean, we had the same kind
22  of conversation that we're having right now.
23  Q.   Okay. Do you recall if you -- well, did you
24  tell the Arlington Police Department that you suspected
25  her of stealing the machines from the storage unit?

60

1   A.   I told the Arlington Police Department that
2   she's the one that had access to it.
3   Q.   And other than you, she's the only person with
4   the key; correct?
5   A.   Yes.
6   Q.   Or, sorry, she was the only person with the
7   key; correct?
8   A.   Yes.
9   Q.   Why didn't you mention Troy to the police?
10  A.   Because my primary interaction was with
11  Norma. I don't know. I mean, it -- they're husband
12  and wife. I didn't think it was necessary to list
13  everybody.
14  Q.   Okay. And that brings up another point,
15  actually. Did you request identification or any sort
16  of proof of address, documents, from Norma or Troy when
17  you hired them?
18  A.   I did get a W-9 from Troy.
19  Q.   And did you request one from Norma or no?
20  A.   No.
21  Q.   Why not?
22  A.   Well, what I did is I requested a W-9 from
23  them as a group. And my assumption is that they filed
24  taxes jointly; if I'm paying one or the other, it
25  doesn't really make a difference.

61

1  Q. So that's something that you never really
2  looked into?
3  A. No.
4  Q. Okay. Did anyone, other than Norma and Troy,
5  service the machines from the time Paul stopped until
6  you discovered that they were missing?
7  A. I don't think so.
8  Q. Okay. Norma and Troy were your primary
9  contacts?
10 A. Yes.
11 Q. And they were the people that, day-to-day,
12 took care of and serviced the machines?
13 A. Yes.
14 Q. And you trusted them to take care of the
15 machines, obviously?
16 A. Yes.
17 Q. Do you have current contact information for
18 Norma or Troy?
19 A. I have the last contact information for them.
20 Q. And you've already provided that to the
21 investigator; correct?
22 A. Yes.
23 Q. Have you had any contact with Norma or Troy
24 since then?
25 A. No.

62

1  Q. Okay. And do you have -- the other thing that
2  I know that we're missing is documentation for the
3  specific storage unit, with respect to your payments
4  per month for it. And I believe you also told the
5  investigator that you had a cancellation contract for
6  that storage unit at some point?
7  A. Yes.
8  Q. And those are all things that you can provide
9  to us?
10 A. Yes.
11 Q. Okay. Did you ever e-mail back and forth with
12 Norma or Troy?
13 A. Yes.
14 Q. And can you provide copies of those e-mails?
15 A. Yes.
16 Q. And what would you guys e-mail about?
17 A. You know, sometimes she would send me sales
18 reports by e-mail, or some updates about, you know,
19 how's it going with the machines, what issues are they
20 having, things like that.
21 Q. And with respect to sales reports, I know that
22 you've provided a lot of, kind of, handwritten notebook
23 pages?
24 A. Yes.
25 Q. Is there anything -- are there any other sales

63

1  records, in addition to what you've already provided
2  us?
3  A. I don't believe so.
4  Q. So is it fair to say that sometimes you would
5  receive sales reports and sometimes you would not?
6  A. Yes.
7  Q. Okay. And when you weren't receiving sales
8  reports, how did you tell, you know, how much money the
9  machines were making?
10 A. It would be just the next time I would receive
11 sales reports, finding out.
12 Q. Okay.
13 A. It's easy to divide by weeks.
14 Q. Yeah. Okay. You also provided bank
15 statements to us; correct?
16 A. I believe so.
17 Q. Or to the insurance company; correct. The
18 bank statements have an address that's in California --
19 A. M'hum.
20 Q. -- I believe. What is that address for?
21 A. The address is for my statutory agent, I
22 think.
23 Q. Okay.
24 A. For the L.L.C.
25 Q. For Arcade?

64

1  A. Yes.
2  Q. Do you have any partners in Arcade?
3  A. Yes.
4  Q. And who are they?
5  A. They're a trust in another L.L.C.
6  Q. Is it the last trust?
7  A. I think that that's the one that we used for
8  it, yes.
9  Q. And what's the other L.L.C.?
10 A. I don't remember what the name of it is, off
11 the top of my head.
12 Q. Okay.
13    Just give me one second, Rosina.
14    THE WITNESS: The view up here would be
15 really nice if there wasn't all that smog. Right?
16    MR. STROJNIK: Everything you say, my
17 friend, is written down by the court reporter.
18    THE WITNESS: Just write this part. It's
19 a really nice skyline. Okay? I'm not saying it's a
20 bad place to be.
21 Q. BY MS. GOLIGHTLY: Did you ever tell Norma and
22 Troy to remove all of the machines from the locations
23 and put them all in the storage unit?
24 A. No.
25 Q. No?

65

1  A.  I don't think so.
2  Q.  No? Okay. If that was -- if that is
3  something that they have said to one of the
4  investigators, would you disagree with that statement?
5  A.  Yeah. I mean, if that was the case, why would
6  I have been able to pick the machines up at Oasis?
7  That doesn't really make any sense.
8  Q.  Fair. So your testimony is that you never
9  ever told Norma or Troy, you know, go to all the
10 locations, pick them up, and put them in the storage
11 unit?
12 A.  No.
13 Q.  Okay. I don't think I have much more.
14      When you were interviewed by our
15 investigator, did you understand that the purpose of
16 that interview was related to the claim that you
17 made --
18 A.  Yes.
19 Q.  -- at Arcade?
20 A.  Yeah.
21 Q.  And would you also agree with me that it's
22 reasonable for the insurance company to rely on your
23 statements made during that interview?
24      MR. STROJNIK:  Object to the form.
25 Q.  BY MS. GOLIGHTLY:  Oh, you can answer, if you

66

1  can.
2      MR. STROJNIK:  If you know, you can
3  answer.
4      THE WITNESS:  Can you repeat the
5  question, please?
6  Q.  BY MS. GOLIGHTLY:  Sure. Do you think it's
7  reasonable for the insurance company to rely on the
8  statements that you made during that interview?
9  A.  Yeah.
10 Q.  Okay. And did you understand that that
11 interview would be used for purposes of further
12 investigation into your claim?
13 A.  Yeah.
14     MS. GOLIGHTLY:  Okay. I think that's all
15 I've got.
16     MR. STROJNIK:  Fantastic. Do you want to
17 explain reading and signing?
18     MS. GOLIGHTLY:  Huh?
19     MR. STROJNIK:  Do you want to explain
20 reading and signing?
21     MS. GOLIGHTLY:  Oh, sure. You have the
22 opportunity to read and sign your deposition.
23     You can't make substantive changes, but
24 if you said a name wrong or if there's spelling
25 mistakes and stuff like that, you're allowed to make

67

1  those changes.
2      Or if you are comfortable with your
3  testimony here today and you don't feel the need to
4  review the transcript, you can waive your right to read
5  and sign.
6      What would you like to do?
7      THE WITNESS:  Waive it.
8      MR. STROJNIK:  I was just going to say we
9  don't waive but ...
10     But we're going to get a copy of it?
11     THE WITNESS:  Okay.
12     MR. STROJNIK:  At your expense.
13     THE WITNESS:  Excellent.
14     MR. STROJNIK:  And we're going to get it
15 before 30 days are up, and if you can just send us the
16 corrections page, that would be appreciated.
17     COURT REPORTER:  Okay.
18     THE WITNESS:  Oh, okay. So this is
19 asking if we want to get a copy of it.
20     MR. STROJNIK:  Pretty much.
21     THE WITNESS:  Yeah. I want to get a copy
22 of it. I'm sorry.
23     COURT REPORTER:  Off the record?
24     MS. GOLIGHTLY:  Yes. We're good.
25     (10:33 a.m.)

68

7  I, the undersigned, say that I have read
8  the foregoing transcript of testimony taken October 23,
9  2014, and I declare, under penalty of perjury, that the
10 foregoing is a true and correct transcript of my
11 testimony contained therein.

13     EXECUTED this _____ day of
14 _____, 2014.

                                  _____
                                  ALEX CALLAN

ALEX CALLAN   OCTOBER 23, 2014

69

1  STATE OF ARIZONA   )
                     ) ss.
2  COUNTY OF MARICOPA )
3
4      BE IT KNOWN that the foregoing proceedings
   were taken before me, ROSINA SEYMOUR, Certified
5  Reporter No. 50212, that the witness before testifying
   was duly sworn by me to testify to the whole truth;
6  that the foregoing pages are a full, true and accurate
   record of the proceedings, all done to the best of my
7  skill and ability; that the proceedings were taken down
   by me in shorthand and thereafter reduced to print
8  under my direction.
9      [X] Review and signature was requested.
10     [ ] Review and signature was waived.
11     [ ] Review and signature not required.
12     I CERTIFY that I am in no way related
   to any of the parties thereto nor am I in any way
13 interested in the outcome hereof.
14     I FURTHER CERTIFY that I have complied with
   the ethical obligations set forth in ACJA 7-206.
15 DATED at Gilbert, Arizona, this 5th day of November,
   2014.
16         *Rosina Seymour* (signature)
17         ─────────────────────────
           Rosina Seymour, RPR
18         Certified Reporter
           Certificate No. 50212
19
20     *   *   *   *
21
       I CERTIFY that SEYMOUR REPORTING SERVICES has
22 complied with the ethical obligations set forth in
   ACJA 7-206.
23         *Rosina Seymour* (signature)
24         ─────────────────────────
           Rosina Seymour, RPR, Owner
25         Seymour Reporting Services
           Arizona RRF No. R1000