# In The Matter Of:
*Arcade Entertainment vs.*
*AGCS Marine Insurance*

---

*30(b)(6) AGCS Marine Insurance Company - Denise Lupear*
*October 23, 2014*

---

*Glennie Reporting Services, LLC*
*7330 North 16th Street, Suite A100*
*Phoenix, Arizona  85020*
*602.266.6535 Office    877.266.6535 Toll Free*
*www.glennie-reporting.com   office@glennie-reporting.com*



Original File 102314DL.txt
Min-U-Script® with Word Index

Page 3

```
                                           1           30(b)(6) DEPOSITION OF
       UNITED STATES DISTRICT COURT        2       AGCS MARINE INSURANCE COMPANY
           DISTRICT OF ARIZONA             3              (DENISE LUPEAR)
                                           4
ARCADE ENTERTAINMENT, LLC,  ) No. CV-14-01233-PHX-SRB
                            )              5           The 30(b)(6) deposition of AGCS MARINE
        Plaintiff,          )              6  INSURANCE COMPANY (DENISE LUPEAR) was taken on October
                            )              7  23, 2014, commencing at 11:04 a.m., at the law office of
   vs.                      )              8  JONES, SKELTON & HOCHULI, P.L.C., 2901 North Central
                            )              9  Avenue, Suite 800, Phoenix, Arizona, before CAROLYN T.
AGCS MARINE INSURANCE COMPANY,)           10  SULLIVAN, a Certified Reporter, Certificate No. 50528,
                            )             11  for the State of Arizona.
        Defendants.         )             12
                            )             13  APPEARANCES:
                                          14  For Plaintiff:
                                          15      STROJNIK, P.C.
                                                  Peter Strojnik, Esq.
                                          16      2415 East Camelback Road
                                                  Suite 700
                                          17      Phoenix, Arizona 85016
              30(b)(6) DEPOSITION OF      18
          AGCS MARINE INSURANCE COMPANY       For Defendant:
                                          19
                (DENISE LUPEAR)                   JONES, SKELTON & HOCHULI, P.L.C.
               October 23, 2014           20      Chelsey M. Golightly, Esq.
                  11:04 a.m.                      2901 North Central Avenue
                Phoenix, Arizona          21      Suite 800
                                                  Phoenix, Arizona 85012
                                          22
                                          23  Also Present:
                                          24      Alex Callan
                                          25
Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275
                    Prepared by:
602.266.6535        Carolyn T. Sullivan, RPR
www.glennie-reporting.com  Arizona CR No. 50528
```

Page 2

```
 1              I N D E X
 2  WITNESS                           PAGE
 3  DENISE LUPEAR
 4      Examination by Mr. Strojnik      4
 5
 6
 7
 8
 9
10          INDEX TO EXHIBITS
11  Description                        Page
12  Exhibit 1   Withdrawn
13  Exhibit 2   First notice of loss for claim    8
14  Exhibit 3   3/3/14 letter to Michael Scotko from   56
                Peter Strojnik
15
```

Page 4

1　　　　DENISE LUPEAR,
2  called as a witness herein, having been first duly sworn
3  by the Certified Reporter to speak the whole truth and
4  nothing but the truth, was examined and testified as
5  follows:
6
7　　　　　　　　EXAMINATION
8  BY MR. STROJNIK:
9　　Q.　Ms. Lupear, my name is Peter Strojnik. I'm the
10  lawyer for the insured, Arcade Entertainment. We met
11  just a minute ago. It's nice meeting you.
12　　A.　It's nice to meet you.
13　　Q.　Can you state your name for the record.
14　　A.　Denise Lupear, L-u-p-e-a-r.
15　　Q.　I'm going to use the pronoun "you" quite a bit
16  in the deposition today. When I use the pronoun "you," I
17  don't mean you, Ms. Lupear. I mean your employer, the
18  insurer of the claim that we're discussing today. Okay?
19　　A.　Okay.
20　　Q.　If there's a question whether I mean you
21  personally or whether or not I mean the insurer, just let
22  me know, and I'll make it clear.
23　　A.　Okay.
24　　Q.　Have you had your deposition taken before?
25　　A.　Yes.

Case 2:14-cv-01233-SRB   Document 23-3   Filed 01/05/15   Page 3 of 18

Arcade Entertainment vs.
AGCS Marine Insurance
30(b)(6) AGCS Marine Insurance Company - Denise Lupear
October 23, 2014

Page 5

1  Q. How many times?
2  A. Three or four.
3  Q. In each one of the depositions, the lawyers
4  told you what the rules of the deposition are, correct?
5  A. Yes.
6  Q. So I'm not going to do that today. You know
7  what they are?
8  A. Yes.
9  Q. Okay. Do you know what this case is about?
10 A. Yes.
11 Q. What is it about?
12 A. Equipment that was used for a kind of arcade
13 games that has gone missing and were reported as stolen.
14 Q. Back in August of 2013, Arcade made a claim
15 against your employer, the insurer, correct?
16 A. I believe the claim was made in October, yes.
17 Q. In early October?
18 A. Yes.
19 Q. When did the loss occur?
20 A. I believe it was late August.
21 Q. At the time that the loss occurred, do you know
22 whether or not a policy of insurance was in existence
23 between Arcade and your employed, the insurer?
24 A. Yes.
25 Q. Let me show you what is about to be marked as

Page 6

1  Exhibit No. 1.
2      (Exhibit 1 was marked.)
3  Q. BY MR. STROJNIK: Let me just ask you if you
4  recognize that document. And you can consult with your
5  counsel to make sure that it is what it purports to be.
6      MS. GOLIGHTLY: There's more than one policy
7  in here, correct?
8      MR. STROJNIK: This is everything that was
9  produced by your firm.
10     MS. GOLIGHTLY: Yeah.
11     THE WITNESS: This must have been the
12 current one that was produced.
13     MS. GOLIGHTLY: I don't think we produced
14 this one, Peter.
15     MR. STROJNIK: That was actually produced by
16 Mr. Scotko.
17     MS. GOLIGHTLY: Yeah, because we produced --
18 this isn't the policy for the -- this is 2013 to 2014.
19 This is December of -- but...
20     MR. STROJNIK: Well, I withdraw Exhibit
21 No. 1, obviously. So you don't have to look at it
22 anymore.
23 Q. BY MR. STROJNIK: Do you know whether or not in
24 August of 2013 there was a policy of insurance in
25 existence between Arcade, my client, the insured, and

Page 7

1  your employer, the insurer?
2  A. Yes.
3  Q. Do you know whether or not that policy covered
4  losses to certain gaming equipment?
5      MS. GOLIGHTLY: Form.
6      MR. STROJNIK: How can I improve on the
7  form?
8      MS. GOLIGHTLY: Well, to the extent that
9  she's talking about any sort of coverage issues, we
10 discussed yesterday that she's not the person designated
11 to talk about that.
12 Q. BY MR. STROJNIK: Let me rephrase that.
13 Counsel is correct. We talked about the fact that today
14 you cannot testify about coverage issues. You can only
15 testify about investigation issues. Is that correct?
16 A. Correct.
17 Q. Now, when you get involved in investigations of
18 claims, you have to know what the coverage is, don't you?
19 A. I do. I have a claims handler background. As
20 my investigator role, I do understand that property can
21 be covered under the policy.
22 Q. So when the claim comes to the insurer, what
23 does the insurer do?
24 A. As the claims handler or as the company?
25 Q. As the insurer. When the claim is made to the

Page 8

1  insurance company, such as your employer, what is -- what
2  does the insurer, such as your employer, do in that
3  situation? Do they simply pay the policy? Do they
4  request more information? Do they investigate? What do
5  they do?
6  A. Each claim is reviewed by a claim handler.
7  They look at the facts of the loss. They review the
8  coverage. And then if there's investigation that's
9  needed, they consult with myself, and we talk about what
10 investigation steps need to be taken.
11 Q. In this particular case -- and I will ask you
12 to look at Exhibit No. 2.
13     (Exhibit 2 was marked.)
14 Q. BY MR. STROJNIK: A claim appears to have been
15 made. Can you take a look at Exhibit 2 and let me know
16 if you recognize that document.
17 A. Yes, I recognize the document.
18 Q. What is that document?
19 A. That is the first notice of loss for the claim.
20 Q. So this is the notice of loss that was produced
21 by Arcade to your employer, the insurer, on this claim,
22 correct?
23 A. Yes.
24 Q. Now, you mentioned to me that the claim goes to
25 the claim handler.

Page 9

1  A.  Yes.
2  Q.  Who was that in this case?
3  A.  Michael Scotko.
4  Q.  What is his obligation once he receives the
5  claim?
6      MS. GOLIGHTLY: Form.
7  Q.  BY MR. STROJNIK: Go ahead and answer.
8  A.  He is to review the information he's received.
9  Look to see where, if the policy is in effect, its
10 coverage. Looks at those aspects of it. Looks to see if
11 there's investigation that needs to be done or if it's a
12 complete first notice of loss and there's enough
13 information for them to handle the claim.
14 Q.  What happened in the claim made by Arcade? Was
15 additional information required? Was additional
16 investigation required? Or was the claim approved and
17 accepted immediately?
18 A.  Mr. Scotko contacted me about getting an
19 investigator involved on this loss.
20 Q.  Do you recall approximately when he contacted
21 you?
22 A.  It was within the first week.
23 Q.  What did he tell you as to why the
24 investigation was required?
25 A.  We talked about the claim, and my understanding

Page 10

1  was there was just information he was unclear about. We
2  felt that a statement from the insured would be necessary
3  to clarify some of the missing information. Just the
4  fact that the -- there were three different locations,
5  three police reports. It just seemed like we needed to
6  talk with the insured directly and get more information
7  from him about the loss.
8  Q.  Was there any type of information you were
9  looking for?
10 A.  Really information to validate the claim
11 information about the gaming machines, information about
12 the people that were involved with the running of the
13 day-to-day operations.
14 Q.  Was there any reference made to any exclusions
15 in the policy with respect to your investigation?
16 A.  At the early onset, I don't recall if there
17 were or not.
18 Q.  Did Mr. Scotko ask you to go call Mr. Callan
19 and get his statement?
20 A.  We talked about hiring an investigative firm
21 that would do that in person, and that was my
22 responsibility, was to coordinate that.
23 Q.  When did you coordinate that?
24 A.  It was within the first day or two that Michael
25 and I talked.

Page 11

1  Q.  Now, when you hired this investigative person,
2  did you explain to this investigative person what the
3  scope of the investigation was?
4  A.  Yes.
5  Q.  What did you tell him or her?
6  A.  We needed a statement from our insured about
7  the business, about how the machines came into being,
8  where they were located. Just run the whole gamut on
9  getting the information about the business and trying to
10 determine what he knew about the loss as well.
11 Q.  Why was that important?
12 A.  We were confused on the information that was
13 here. It just wasn't here. There were some concerns
14 about whether or not the people that were involved may
15 have done something with the machines. And we just
16 needed to get a good general overall view of what we were
17 dealing with.
18 Q.  If you look at Exhibit No. 2, can you show me
19 what in Exhibit No. 2 caused you to be concerned about
20 the people involved.
21 A.  Really just the fact that these items were
22 missing. That the service contractor was the last one
23 that knew where they were. They weren't -- according to
24 just the basic information we had in the beginning, it
25 didn't appear that these would be easy to take. They're

Page 12

1  gaming machines, I understand, like being an arcade game.
2  I don't know if they were the size of a pinball machine
3  or Pac-Man machine. It wouldn't be something that
4  somebody could easily pick up and walk off with.
5  Q.  You referenced service contractors. Do you
6  know who they were?
7  A.  I believe that's what is mentioned here in the
8  police report, that was Ms. Norma Reveles.
9  Q.  Norma Reveles and Troy?
10 A.  Troy's name was never mention in this --
11 Q.  Okay.
12 A.  -- so at that point we didn't know about Troy.
13 Q.  So when you first looked at Exhibit No. 2, you
14 concluded that there could be issues with respect to
15 where the equipment went?
16 A.  Yes.
17 Q.  And there was a question whether or not the
18 equipment had been improperly taken by someone?
19 A.  Yes.
20 Q.  Was there a question whether or not Norma was
21 an employee of Arcade?
22 A.  At that point we didn't know. That's what we
23 were asking about when we were asking to interview
24 Mr. Callan.
25 Q.  You referenced her as a contractor. Why did

Page 13

1  you reference her as a contractor?
2  A.  That's what it says here in the police report.
3  Q.  Is there some reason you believe that she was
4  not a contractor?
5  A.  At that point in time, we didn't know.
6  Q.  Was there any reason you believed that she was
7  not a contractor? I understand you didn't know. But did
8  you have some reason to believe that she was not a
9  contractor?
10 A.  We weren't sure if she was a contractor or an
11 employee. We didn't know how she was being paid at that
12 point. We didn't have any information about her role.
13 Q.  I understand. So you were charged with
14 investigating whether she was or was not an employee; is
15 that correct?
16 A.  Correct.
17 Q.  Why was that important?
18 A.  When I was speaking with Mr. Scotko, the claims
19 adjustor, part of the policy provisions I think have to
20 do with employee status.
21 Q.  Do you recall what that policy provision might
22 be?
23 A.  I believe there could be an exclusion. I don't
24 do the coverage piece of this. He gives me direction on
25 what investigation we need to go through.

Page 14

1  Q.  So Mr. Scotko told you, please go and find out
2  whether or not Norma is an employee of Arcade?
3  A.  That was one of the objectives we had.
4  Q.  That's one of the issues. What were the
5  remaining issues?
6  A.  Really gathering the facts of the loss. Trying
7  to figure out how these machines disappeared, where they
8  were. Did they -- in a general sense, did they exist.
9  Do we have records to show that they were in operation.
10 And just try and track down where they were. Can we find
11 out really more information about this theft, this
12 reported theft. Understanding we know that police
13 departments a lot of times don't have the resources to do
14 that. We like to investigate and try and help get to the
15 bottom of what really occurred.
16 Q.  So when you first received Exhibit No. 2, you
17 did not believe it was a legitimate claim, did you?
18 A.  Oh, I never said that.
19 Q.  Did you believe this was a legitimate claim?
20 A.  We investigate every claim on its merits, and
21 we were looking at this claim to get to the bottom of
22 what occurred.
23 Q.  I understand. My question is somewhat
24 different, though. Did you believe -- at the time you
25 received the claim, did you believe this was a legitimate

Page 15

1  claim or did you believe it was an illegitimate claim?
2  A.  At the time we received the claim, we believed
3  it was a legitimate claim and a theft occurred.
4  Q.  If you believed this was a legitimate claim,
5  why didn't you pay it?
6  A.  We had a lot of holes in the facts that were
7  presented in just this first notice of loss that we
8  needed to clarify.
9  Q.  Where are these holes in Exhibit No. 2?
10 A.  I think I've already covered that. There was a
11 lot of information that just isn't here. I mean, on the
12 face of it, as a reasonable person, there's not enough
13 information to just pay it on the face of this claim. We
14 need to investigate this loss.
15 Q.  This is a form that is prepared by the insurer,
16 correct?
17 A.  The -- by Mr. Callan.
18 Q.  This is the form. This claim is made on a
19 form.
20 A.  Yes.
21 Q.  Is this form prepared by Mr. Callan or Arcade
22 or is it prepared by the insurer?
23 A.  I have no idea who prepared this. It may have
24 come from the retail broker. I don't know where it came
25 from.

Page 16

1  Q.  Now, just stay with me if you could. Tell me
2  what on this form caused you to believe that there are
3  some questions about legitimacy of the claim. What on
4  this form Exhibit No. 2 that made you believe there was a
5  problem with the question whether or not this was a
6  legitimate or illegitimate claim.
7  A.  At the time this form came in, we believed
8  there was a claim. We believed there was a theft. There
9  just wasn't enough information for us to settle the claim
10 based on just this. We needed more information from
11 Mr. Callan to, as I said before, validate the information
12 he provided here, get more details, get more information
13 about the machining, about the people that were involved
14 with moving them. This was just the starting point.
15 Q.  Okay. So at the time you received the claim,
16 you believed that a theft had occurred?
17 A.  Yes.
18 Q.  You believed that a theft had occurred and the
19 insured had a claim for $140,000, as indicating on
20 Exhibit No. 2?
21 A.  At the very outset, we didn't have any idea of
22 the value of the claim. That's what he wrote down.
23 That's what we were investigating also, what the value of
24 the claim was.
25 Q.  So at the very beginning of your involvement,

Page 17

1 there was no question that this was an illegitimate
2 claim, was there?
3     MS. GOLIGHTLY: Form.
4     THE WITNESS: I'm sorry. You're...
5 Q. BY MR. STROJNIK: Let me rephrase. I do this
6 often. I apologize for that. When you received the
7 claim which is Exhibit No. 2, you looked at it, and I
8 believe you testified that you believed that a theft had
9 occurred.
10 A. Yes.
11 Q. Now, if the theft had occurred, you would have
12 paid the claim, would you not have?
13 A. After we validate the facts.
14 Q. I understand. But if a theft had occurred, you
15 would pay the claim. Correct or incorrect?
16 A. It's a little more detailed than that. We
17 would have to evaluate the claim. The adjustor would
18 have to evaluate the coverage once we get the facts of
19 the loss investigator.
20 Q. Let me just tell you where I'm going. Can I
21 tell you?
22 A. Sure.
23 Q. You get a claim. The insurance company gets a
24 claim. And for 14 months, the insurance company
25 investigates and doesn't pay the claim. I'm trying to

Page 18

1 figure out when it was that the insurance company first
2 knew that this was a good, legitimate claim that should
3 be paid. And I'm trying to figure out why the insurance
4 company investigated all these facts that may turn out to
5 be completely irrelevant on the basis of showing that the
6 insurance company simply didn't pay the claim because
7 they didn't want to pay the claim. So that's where I'm
8 going. I'm being aggressive. But now that you know
9 where I'm going with this, help me understand my theory.
10     When you received Exhibit No. 2, you
11 believed that a theft had occurred, correct?
12 A. Yes.
13 Q. And then you investigated to disprove your
14 belief that a theft had occurred. Correct or incorrect?
15 A. Incorrect.
16 Q. So why did you investigate?
17 A. We're investigating to validate the facts of
18 the loss to see how the theft occurred, where the theft
19 occurred, to validate where the machines were, to get the
20 values of those machines. There was a lot of information
21 we gathered and are still trying to gather. There's
22 people we're still trying to speak with. We're still
23 trying to get more information about this claim. And
24 each step of the way, from day 1 to day 30. We got
25 Mr. Callan's statement. More questions came up. More

Page 19

1 information was received. More information was
2 requested, investigate was done.
3     And as we went through all of this, when we
4 were finally able to find Mr. Mitchell and Ms. Reveles,
5 the information then changed. And we were told by them
6 that the machines were moved at the request of Mr. Callan
7 and that they moved them.
8 Q. Okay. Now, can you take as a fact the
9 following: Take as a fact that if a theft had occurred
10 and no exclusion applied that the insurance company would
11 have an obligation to pay?
12     MS. GOLIGHTLY: Form.
13     THE WITNESS: Outside of --
14 Q. BY MR. STROJNIK: Outside of whatever exclusion
15 there might be.
16 A. Each claim on its own merits, the investigation
17 has to support that. But we could say that.
18 Q. Now, if a theft had occurred, what difference
19 does it make how it occurred?
20 A. I'm not in the coverage department. I don't
21 work with that. But I understand that there are certain
22 exclusions that could apply to a claim even if a theft
23 had occurred.
24 Q. I understand that. I understand that. My
25 question is somewhat different. I want to figure out why

Page 20

1 it is that once you concluded or accepted the fact that a
2 theft had occurred, you wanted to find out more about how
3 the theft had occurred. If the theft had occurred, you
4 would agree with me, the policy would have to be paid?
5     MS. GOLIGHTLY: Form.
6     THE WITNESS: It's not that simple. Claims
7 and investigations and coverages and everything that come
8 in, it's not that simple. Each claim on its own merits
9 has to have the appropriate investigation. And when that
10 investigation leads to more and more questions and more
11 investigation -- we still haven't concluded on this claim
12 our investigation.
13 Q. BY MR. STROJNIK: Okay. Now, the entity who
14 decides whether or not more investigation is needed is
15 the insurer, not the insured, correct?
16 A. Correct.
17 Q. Does the insured have any say in the amount of
18 investigation you conduct?
19 A. No.
20 Q. So, in other words, the insurer, in this case
21 your employer, can conduct investigations going on for
22 ten years, correct?
23 A. If the facts support continued investigation,
24 we can continue the investigation.
25 Q. You can go for ten years if you want to,

Case 2:14-cv-01233-SRB   Document 23-3   Filed 01/05/15   Page 7 of 18

| Arcade Entertainment vs. | 30(b)(6) AGCS Marine Insurance Company - Denise Lupear |
| AGCS Marine Insurance | October 23, 2014 |

Page 21

1 correct?
2   A.   Depending on the legalities and the
3 jurisdiction, if that's available, yes.
4   Q.   And the person who decides whether or not the
5 facts require more investigation is the insurer, not the
6 insured, correct?
7   A.   Correct.
8   Q.   And the insurer is your employer?
9   A.   Yes.
10  Q.   Is the insurance company, correct?
11  A.   Yes.
12  Q.   So your position is that the insurance company
13 can decide to investigation for as long as they want to
14 or as long as they believe that additional information is
15 necessary and not pay the claim; is that correct?
16       MS. GOLIGHTLY: Form.
17       THE WITNESS: Yes.
18  Q.   BY MR. STROJNIK: Even if it takes ten year?
19  A.   I would think at some point we would have come
20 to the end of the investigation. But ten years is pretty
21 unlikely. Ten months, five months, ten weeks. Each
22 claim on its own merits deserves a fair and appropriate
23 evaluation on what is missing in the information, what is
24 still needed to help validate the claim. What can we do
25 to rule out red flags. What can we do to confirm and

Page 22

1 validate that the claim happened and what the damages
2 are.
3   Q.   I understand that. I understand. And all that
4 decision making and all that discovery is conducted by
5 the insurer and not by the insured, correct?
6   A.   Yes.
7   Q.   The insurer has absolute control over the
8 investigation; is that correct?
9   A.   Correct. But also the insured is requested to
10 help and provide and cooperate, yes.
11  Q.   Did the insured cooperate in this case?
12  A.   For the most part. I know some of the
13 information we received was kind of piecemeal or not
14 complete when we requested documents or information.
15  Q.   What information did the insured not provide to
16 you that you requested?
17  A.   I know there were a couple requests made over
18 time for the records on the payouts on the machines, the
19 documentation information, and contact information for
20 Norma and Troy once we learned who those people were. I
21 think Paul Pearce also.
22  Q.   Let's talk about your request for information
23 regarding the payouts on the machine. Why is that
24 relevant?
25  A.   We wanted to know where the machines were

Page 23

1 located. We wanted to know if they were being used, if
2 they were abandoned, if there was actual business taking
3 place.
4   Q.   Why does that make any difference?
5   A.   It went to the basis of the claim that they
6 were in locations and they were stolen from those
7 locations.
8   Q.   Why does the location make any difference?
9   A.   I think the location where the machines were
10 stolen from is very relevant to know that they were in
11 place and where they were located when this theft took
12 place.
13  Q.   How is it relevant? You mentioned to me that
14 you don't know about coverage and you cannot testify to
15 coverage. How is the location of the machines relevant
16 to coverage?
17  A.   I think the location of the machines is
18 relevant the machines' existence and that they were
19 where -- I believe, and I don't know about the exact
20 locations, but where they were said to have been stolen
21 from in the police reports.
22  Q.   This is what I'm trying to get to. You believe
23 that the machines were stolen. But then you investigated
24 where the machines were stolen from. My question is,
25 what difference does it make?

Page 24

1   A.   I think as a claims -- in thorough claims
2 handling, to have that information and know where they
3 were stolen from would help us if in fact there is any
4 rediscovery or the police are investigating and find this
5 or they come to us and ask for information about what
6 we've learned in our investigation. Just thorough claims
7 investigation.
8   Q.   Thorough claims investigation. Correct?
9   A.   Uh-huh.
10  Q.   You have to answer yes or no audibly.
11  A.   Yes.
12  Q.   So during your thorough claims investigation,
13 which has now taken 14 months, you knew as of October
14 that the machines had been stolen. Correct?
15  A.   Yes.
16  Q.   But then you wanted to find out where they were
17 stolen from. Correct?
18  A.   Yes.
19  Q.   And you've testified that that's important in
20 your overall claims investigation. Correct?
21  A.   Yes.
22  Q.   And you wanted to know if the machines even
23 existed, correct?
24  A.   Yes.
25  Q.   Was there some reason you believed that the

Case 2:14-cv-01233-SRB   Document 23-3   Filed 01/05/15   Page 8 of 18

Arcade Entertainment vs.
AGCS Marine Insurance
30(b)(6) AGCS Marine Insurance Company - Denise Lupear
October 23, 2014

Page 25

1 machines did not exist?
2 A. No. It's, again, part of our investigation.
3 If you had a car, we would want to know if it was stolen
4 that you had purchased that vehicle. That it was
5 registered. Prove that it existed.
6 Q. Now, that investigation is done normally before
7 you issue a policy, don't you?
8 A. That's debatable. Yes, most of the time, when
9 you insure a vehicle, they have your registration and
10 your VIN number.
11 Q. When you insure anything, a house, a vehicle, a
12 machine, a locomotive, the insurance company goes out and
13 looks at it, don't they?
14 A. No.
15 Q. Did you do that in this case?
16 A. I don't believe the underwriters did. I can't
17 speak to that, though.
18 Q. So during your investigation of the theft of
19 property that you had no reason not to believe was
20 stolen, you looked into where the property was, you
21 looked at -- or you tried to investigate what the
22 location of the machines or the property was, correct?
23 A. Yes.
24 Q. And then you got into the investigation of
25 Norma -- I think it's Reves? How do you say that name?

Page 26

1 A. I thought it was Reveles.
2 Q. Reveles. And then you got into investigation
3 of what her involvement was, correct?
4 A. Yes.
5 Q. Why was that important?
6 A. Since she was, according to the police reports,
7 probably the last person to have seen the games, we
8 thought it was important to get information from her on
9 where they were, what she last saw, when was the last
10 time she worked with them, and what locations they were
11 at that she knew of.
12 Q. Okay. And then you rushed out and talked to
13 her?
14 A. We tried.
15 Q. And what happened?
16 A. We were unable to find her at first. We ran
17 some background checks to try and get her most current
18 information, and it took us quite a while to find her.
19 Q. But ultimately you did find her?
20 A. Yes.
21 Q. Did you talk with her?
22 A. We were unable to talk with Norma. We talked
23 with Troy, who I believe is her husband.
24 Q. Correct. So you never talked to Norma, who is
25 contractor according to the police report. Right?

Page 27

1 A. Correct.
2 Q. But you talked to Normal's husband, Troy?
3 A. Yes.
4 Q. Do you know Troy's last name?
5 A. Mitchell.
6 Q. But you talked to Troy Mitchell, correct?
7 A. Our investigator did, yes.
8 Q. When did your investigator talk to Troy
9 Mitchell?
10 A. I don't recall the exact time frame. Let's
11 see. I think we finally tracked him down in February or
12 March. I'm not 100 percent sure on the dates.
13 Q. Of 2014?
14 A. Yes.
15 Q. What did Troy Mitchell disclose to your
16 investigator?
17 A. He told us that Mr. Callan had asked them to
18 remove the machines to the storage unit.
19 Q. Okay. What else?
20 A. That was it. They wouldn't give us any other
21 information.
22 Q. So now you knew in February of 2014 that Troy
23 Mitchell had indicated to your investigator that
24 Mr. Callan asked Troy Mitchell to remove the machines to
25 the storage unit?

Page 28

1      MS. GOLIGHTLY: Form.
2      THE WITNESS: Yes.
3 Q. BY MR. STROJNIK: Correct?
4      MS. GOLIGHTLY: Form.
5      THE WITNESS: Yes.
6 Q. BY MR. STROJNIK: Now, what did you do with
7 this information?
8 A. I believe it was around that time we were
9 trying to get them to cooperate for a full statement. We
10 were -- then I think is about when the lawsuit came in,
11 and we were still trying to get them to cooperate for
12 statements. We had more questions then for Mr. Callan.
13 But with the litigation, it finally got to this point
14 where we could ask him those more questions.
15 Q. Have they ever given you a statement?
16 A. No.
17 Q. What happens if they never give you a
18 statement?
19 A. At this point, we're in litigation. We're
20 going to go after and try and get their statements. We
21 weren't able to before, but now we should be able to get
22 them to comply.
23 Q. If we had not been in litigation and Norma and
24 Troy had declined to give you statements, would you then
25 not accept the claim until they gave you the statements?

Page 29

1  MS. GOLIGHTLY: Form. She can't testify to
2  whether or not the insurer will accept the claim.
3  Q. BY MR. STROJNIK: Go ahead and answer if you
4  can.
5  A. We would have contacted Mr. Callan and talked
6  to him again about their information that they provided
7  us and again requested to try and get their statements.
8  It would have been a point then where we may have -- I
9  can't even tell you. We would talk to Mr. Callan at that
10 point.
11 Q. But as matters stood, because you did not get a
12 statement from Troy or from Norma, you declined to accept
13 the claim?
14 A. We have not declined to accept the claim. We
15 still are investigating the claim.
16 Q. Okay. Let me rephrase my question, then. In
17 your investigation, you feel that you have to get a
18 statement from Norma and from Troy, correct?
19 A. It definitely is on our list of items to get,
20 yes.
21 Q. Do you feel it is necessary for you to get a
22 statement from Norma or from Troy or from the both of
23 them to determine whether or not to accept or deny the
24 claim?
25    MS. GOLIGHTLY: Form.

Page 30

1     THE WITNESS: Yes.
2  Q. BY MR. STROJNIK: If you never talk to them,
3  that means that you can never make a choice of whether to
4  accept or deny the claim, correct?
5  A. Had we not been in litigation --
6  Q. Pardon me. Can you focus on my question and
7  just answer the question, please.
8  A. Can you restate the question.
9     MR. STROJNIK: Can you read the question
10 back, please.
11    (The requested portion of the record was
12 read by the reporter.)
13    THE WITNESS: I can't answer yes or no to
14 that question because it would have involved additional
15 work in speaking with Mr. Callan and going and speaking
16 with him.
17 Q. BY MR. STROJNIK: Now, after you were unable to
18 speak to Norma or to Troy, somebody called Mr. Callan,
19 correct?
20    MS. GOLIGHTLY: Form.
21    THE WITNESS: I don't know. If you have
22 something specific that you're referring to, I don't
23 recall off the top of my head.
24 Q. BY MR. STROJNIK: I thought I said a minute ago
25 that if you could never talk to Norma or Troy that you

Page 31

1  would have to talk to Mr. Callan again and try to get a
2  statement from him?
3  A. Correct. I did say that, yes.
4  Q. So now you haven't been able to talk to Norma
5  or to Troy.
6  A. Correct.
7  Q. Did you talk to Mr. Callan again?
8  A. We did not, as we were entered into litigation
9  around that time.
10 Q. Did anybody call Mr. Callan?
11 A. I don't know. I don't know if Mr. Scotko did
12 or not.
13 Q. Now, Mr. Callan's deposition was given today to
14 your counsel.
15 A. Yes.
16 Q. Now that you have the deposition, now can you
17 make a decision?
18 A. We have to review that information and
19 determine whether or not we could or not. I don't know.
20 I don't know what he's testified to.
21 Q. Do you have any -- let me rephrase. What does
22 the adjective "immediate" mean to you?
23 A. "Immediate" is something that you do right
24 away.
25 Q. As, for example, receiving a phone call from

Page 32

1  the hospital, Johnny stood up and visited his mother
2  immediately. That would be a proper use of the in this
3  case adjective "immediately"?
4  A. Yes.
5  Q. "Immediate" means right away, correct?
6  A. Yes.
7  Q. What does the term "adequate" mean to you?
8  A. Sufficient.
9  Q. Do you feel that the insurance company
10 conducted an immediate and adequate investigation in this
11 case?
12 A. I believe we do. We started the investigation.
13 We followed through on our -- every time that we would
14 get information, we would review it. They would we would
15 then look to see what was needed for the case, and we are
16 continuing that immediate and adequate investigation.
17 Q. Now, the way that you explained your answer to
18 me, it seems to me that you would also consider a
19 ten-year investigation to be immediate and adequate if
20 you can't get the information you want. Correct?
21 A. If the information we need to evaluate the
22 claim is not apparently available but we're continuing
23 our efforts to try and get it through investigation, it's
24 a process. You get information, you review it. You go
25 to the next step. Is there's something else we need. So

Page 33

1  if we're addressing these issues, as we do as they come
2  up and move forward and address them, we're still moving
3  the claim forward and doing an immediate in that sense
4  and adequate investigation.
5      Q.  So even a ten-year investigation would be
6  considered by you, "you" being the insurance company, to
7  be immediate and adequate?
8      A.  As we're responding to the information that is
9  come in and acting on it, yes.
10     Q.  Did you investigate whether or not Norma
11 Reveles or Troy Mitchell were employees of Arcade?
12     A.  We attempted to investigate that. I know it
13 was asked of Mr. Callan during his first statement.
14 There was some confusion and not quite clear the role of
15 them. I think there was a W-9 that was obtained for
16 Mr. Mitchell, but that was it. And then we talked about
17 how they were paid or how Norma was paid.
18     Q.  Did you conclude whether or not -- or did you
19 reach a conclusion whether or not Norma was an employee
20 of Arcade?
21     A.  No, not yet.
22     Q.  You need more information obviously?
23     A.  Yes.
24     Q.  What information do you need?
25     A.  Her statement would be very helpful to that.

Page 34

1  Based on everything else that we have, it's clear that
2  the property was entrusted with her. It's clear that she
3  had control of it. But to what extent she was an
4  employee or a contractor or -- we're still unclear.
5      Q.  So as of today, you do not know -- "you" being
6  the insurance company -- you do not know whether or not
7  Norma was an employee?
8      A.  I would not know, yes.
9      Q.  As of today, you do not know whether Troy
10 Mitchell was an employee, do you?
11     A.  We do not know.
12     Q.  Did your investigation disclose whether or not
13 Troy or Norma were partners in Arcade?
14     A.  I believe the investigation when Mr. Callan was
15 interviewed that they were not partners. He had other
16 partners in the company.
17     Q.  The only investigation thus far disclosed
18 whether or not Troy and/or Norma were directors of
19 Arcade.
20     A.  I don't believe that was ever addressed.
21     Q.  Is it your belief, "you" being the insurance
22 company, that they were directors of Arcade?
23     A.  I don't think the insurance company has taken a
24 position on that because it's still outstanding.
25     Q.  Do you have any evidence to indicate that they

Page 35

1  were directors of Arcade?
2      A.  No.
3      Q.  Do you have any information that they were
4  directors of Arcade?
5      A.  Not at this time.
6      Q.  Are you still looking into that question?
7      A.  Yes.
8      Q.  Did you say yes?
9      A.  Yes.
10     Q.  When did you start looking into the question
11 whether or not they were directors of Arcade?
12     A.  Well, directors are I would say, taking that
13 word literally, employed or involved with or partners or
14 contractors with Arcade. We're looking at the whole
15 scope of what their role was with Arcade.
16     Q.  But I want to be very specific. And the reason
17 why I want to be specific is because the policy is
18 specific. And I want to know what you investigated so I
19 can compare your investigation with what the policy says.
20 So if you can just stay with me and answer each question
21 separately, not as one big ball of questions, we
22 investigated everything. Now, you told me you
23 investigated whether or not Troy and Norma were
24 employees, and you concluded that you don't know.
25     A.  Correct.

Page 36

1      Q.  You concluded they were not partners?
2      A.  Correct, based on Mr. Callan's testimony.
3      Q.  As of today, you are still investigating
4  whether or not they were directors?
5      A.  That question is unanswered, correct.
6      Q.  And as of today, you're still investigating
7  whether they are the trustees.
8      A.  Correct.
9      Q.  Now, what investigations have you conduct to
10 determine whether Troy and Norma were trustees of Arcade?
11     A.  The questions were asked of Mr. Callan as well
12 as again trying to -- and we will be getting hopefully
13 the statements of Norma and try to ask them those
14 questions, what was their understanding of their role.
15     Q.  Did you ask Mr. Callan whether or not Troy or
16 Norma were trustees of Arcade?
17     A.  I don't believe so.
18     Q.  Why not?
19     A.  I don't know that that came up. Whether he
20 said that they weren't partners or whether he said who
21 the partners were and that their role was in a different
22 aspect, that they were the servicing people out there
23 taking care of the machines. Him not bringing up that
24 they were trustees or directors or partners, we made the
25 assumption that they weren't involved in the actual

Case 2:14-cv-01233-SRB   Document 23-3   Filed 01/05/15   Page 11 of 18

Arcade Entertainment vs.
AGCS Marine Insurance
30(b)(6) AGCS Marine Insurance Company - Denise Lupear
October 23, 2014

Page 37

1  company of Arcade, in the construction of the company.
2  Q.  What investigation did you conduct to determine
3  whether or not they were directors?
4  A.  I would say the same that I just discussed.
5  Q.  What is an employee?
6      MS. GOLIGHTLY: Form.
7      THE WITNESS: It would be someone that is
8  directed by an owner of a company or someone that's
9  giving them directions to the role that they're playing
10 in respect to the relationship between the person that's
11 paying them and the work that they are doing.
12 Q.  BY MR. STROJNIK: Is there a difference between
13 an employee and a contractor?
14 A.  Sure.
15 Q.  What is the difference?
16     MS. GOLIGHTLY: Form and foundation.
17 Q.  BY MR. STROJNIK: You get to answer anyway.
18 A.  It would depend on the practices of how they
19 were hired, how they were paid, whose direction and who's
20 giving them the control over the property. I mean, I'm
21 sure there's formal definitions out there, but in my
22 layman's terms, it really just depends on how they're
23 paid and what work they're doing at whose direction and
24 discretion and who's entrusted with the property or the
25 job to do.

Page 38

1  Q.  Did you determine in your investigation whether
2  or not Troy or Norma were contractors or whether they
3  were employees?
4  A.  That's still undetermined.
5  Q.  I believe you testified that in order for you
6  to determine that, you have to talk to Troy and/or Norma,
7  correct?
8  A.  Yes.
9  Q.  But you haven't been able to do that?
10 A.  Correct.
11 Q.  You have not been able to do that since the
12 claim was made in October of last year?
13 A.  Correct.
14 Q.  A year ago, correct?
15 A.  Correct.
16 Q.  You have been unable to bring Norma or Troy to
17 talk to your investigators; is that correct?
18 A.  That's correct.
19 Q.  And I believe you testified earlier that if you
20 can't talk to them even for ten years, the claim would
21 remain open.
22     MS. GOLIGHTLY: Form.
23     THE WITNESS: I would say that's taking it
24 pretty liberally. But, again, our investigation needs to
25 be thorough. We're trying to work with that. Now that

Page 39

1  we're in the position we can get their statements or
2  their depositions, we will be doing that.
3  Q.  BY MR. STROJNIK: Let me rephrase the question.
4  You testified that until you can talk to Troy or Norma or
5  both of them, you cannot determine whether or not they
6  were employees?
7  A.  Correct.
8  Q.  And if that took ten years, you would not be
9  able to determine whether or not they are or are not
10 employees?
11 A.  Correct.
12 Q.  And if it took ten years, you would not be able
13 to determine whether or not a particular exclusion in the
14 policy would apply to them, correct?
15     MS. GOLIGHTLY: Form and foundation.
16     THE WITNESS: My job is to get their
17 statements. The task of the adjustor and the manager is
18 to review the coverage. But I would need their answers,
19 yes.
20 Q.  BY MR. STROJNIK: And I believe you testified
21 even if it took ten years, you would consider that
22 investigation to be immediate and adequate?
23 A.  Yes.
24 Q.  Do you know what the term "authorized
25 representative" means?

Page 40

1  A.  In general terms, yes. Someone that's given
2  permission to work on someone else's behalf.
3  Q.  Did you investigate whether or not Troy or
4  Norma were authorized representatives of Arcade?
5  A.  We're still investigating that.
6  Q.  What type of information would you want to have
7  to determine whether or not they are or are not
8  authorized representatives of Arcade?
9  A.  We would need to know what the relationship was
10 between them and Arcade, if there was anything written,
11 if there was anything verbal told to them about what
12 their responsibilities were for whatever they were
13 authorized to do.
14 Q.  You would have to determine two questions,
15 wouldn't you, the first question being whether or not
16 they are representatives, correct?
17 A.  Uh-huh. Yes.
18 Q.  And the second question would be whether or not
19 they are authorized, correct?
20 A.  Yes.
21 Q.  Authorized to do what?
22 A.  Well, that would be what had been discussed
23 between Mr. Callan and Norma and/or Troy with respect to
24 this claim.
25 Q.  I understand. But in your investigation, you

Page 41

1  would have to determine whether or not they had certain
2  authority. And my question is, what type of authority
3  would you be looking at? Would you be looking at the
4  authority of Troy and Norma to sign leases on behalf of
5  Arcade?
6  A.  I would have to go back to what they were asked
7  to do, what their role was, what their job description
8  was. According to Mr. Callan, in that respect, it was to
9  maintain the machines, to repair them, to do the
10  collections. I'm kind of lumping them both in. I know
11  in our understanding, it was just Norma. But then Troy
12  was also involved somehow. So we would have to get the
13  details of all that and what they understood were their
14  responsibilities.
15  Q.  Did you investigate whether or not Troy or
16  Norma were authorized to open bank accounts on behalf of
17  Arcade?
18  A.  We haven't got to that part. We haven't been
19  able to speak with them. That would be -- if they told
20  us that's what they were authorized to do, those are the
21  kinds of questions we would ask. What were you
22  authorized to do.
23  Q.  Now, you did ask questions of Mr. Callan. By
24  "you," meaning your insurance company or your agents.
25  A.  Of his authority representatives'

Page 42

1  responsibilities?
2  Q.  Correct.
3  A.  I believe there were questions about that in
4  the investigation, yes.
5  Q.  And did Mr. Callan relate to you that Norma and
6  Troy had the authority to open bank accounts?
7  A.  No.
8  Q.  They were not authorized to do that, correct?
9  A.  Not from what he told us, no.
10  Q.  Not that you're aware of?
11  A.  Right.
12  Q.  So, clearly, they were not authorized for all
13  purposes to represent Arcade, correct?
14       MS. GOLIGHTLY: Form.
15       THE WITNESS: From what we've learned from
16  the statement, yes.
17  Q.  BY MR. STROJNIK: They might have been
18  authorized for some things but not for all things?
19  A.  Right.
20  Q.  And they could have been representatives of
21  Arcade for some purposes but not all purposes?
22  A.  I would say that's probably accurate because
23  they did go in and represent themselves as Arcade when
24  they did maintenance, according to what Mr. Callan told
25  us.

Page 43

1  Q.  Did you investigate whether or not -- strike
2  that.
3       Did you investigate the limits of Troy's and
4  Norma's authority to represent Arcade in various
5  functions?
6  A.  Based on what Mr. Callan told us in his
7  statement.
8  Q.  Do you know whether or not Troy and/or Norma
9  were members of Arcade Entertainment, LLC?
10       MS. GOLIGHTLY: Form and foundation.
11       THE WITNESS: From the testimony from
12  Mr. Callan from his statement, I don't believe they were.
13  He said they were only himself and two other people.
14  Q.  BY MR. STROJNIK: Do you have any reason to
15  believe that they were managers of Arcade?
16       MS. GOLIGHTLY: Form. Managers or members,
17  Peter?
18       MR. STROJNIK: We'll get to members in a
19  minute.
20       MS. GOLIGHTLY: Well, you said members
21  before.
22       MR. STROJNIK: Oh, did I?
23       MS. GOLIGHTLY: Yes.
24  Q.  BY MR. STROJNIK: Just jump in and tell me I'm
25  messing up. It's okay, really. So just tell me,

Page 44

1  Mr. Strojnik, get your terminology straight. Let's go
2  again.
3       Do you have any evidence or any reason to
4  believe that either Troy or Norma were managers of
5  Arcade?
6  A.  That's undetermined at this time.
7  Q.  You are continuing to look into the question of
8  whether or not Troy and/or Norma are managers -- I'm
9  sorry -- yes, are managers of Arcade, correct?
10  A.  Yes.
11  Q.  And that is continuing to be investigated?
12  A.  Yes.
13  Q.  Have you thought about getting on a website and
14  looking it up?
15  A.  I did. I tried.
16  Q.  And did you find that they were managers?
17  A.  It's not to be found. I mean, the only part
18  that's on there is the LLC, which is Mr. Crane and I
19  believe Mr. Callan and one other person. I can't
20  remember his name.
21  Q.  You did not see Troy's name or Norma's name on
22  there, did you?
23  A.  No.
24  Q.  So would it be fair to say that we know that
25  Troy or Norma are not managers of Arcade?

Page 45

1  MS. GOLIGHTLY: Form and foundation.
2  THE WITNESS: I guess when you say managers,
3  that could be part of the role of what they were
4  entrusted or hired to do. I don't know that a manager
5  would be listed on the LLC paperwork or not.
6  Q. BY MR. STROJNIK: Do you know how LLCs work?
7  A. A bit. There's partnerships and corporation,
8  but it's limited.
9  Q. Well, a limited liability company has members,
10 and then it has either a manager or a manager/member.
11 Are you aware of that?
12 A. Okay.
13 Q. And the reason why I ask you is I'm looking at
14 one of the exclusions, and it says that a claim will be
15 denied if there is dishonest or criminal act committed by
16 a manager or a member if you were a limited liability
17 company.
18       So the term manager means manager of a
19 limited liability company.
20 A. Not a manager in a role of the --
21 Q. Correct. Correct.
22 A. -- hierarchy of employment.
23 Q. So you understand they were not managers of
24 Arcade?
25 A. That's the terminology, yes.

Page 46

1  Q. But you continued to investigate whether they
2  are managers of Arcade?
3  A. We're still investigating what their role was
4  with Arcade. It's more general than just one specific
5  piece. We don't understand what their role was. That's
6  what we need to get from them, what was their
7  understanding of their role.
8  Q. I understand. Were either Troy or Norma
9  members of the Arcade limited liability company?
10 A. I don't believe so.
11 Q. Okay. Are you still investigating that fact or
12 that issue or has that issue been decided?
13 A. In general, we're still investigating what
14 their role was. If they come to us and say, we were
15 members, then that's something we would want to confirm
16 at that point.
17 Q. I'm sorry. You mentioned to me that you
18 conducted or you are conducting an adequate
19 investigation. Do you know how to find out if somebody
20 is a member of an LLC?
21 A. I believe there's filings online.
22 Q. Did you go to the filings online?
23 A. I would have to look at my notes to see on this
24 one if I did or not. I don't recall off the top of my
25 head.

Page 47

1  Q. Wouldn't that be the first place you would go?
2  A. I would want to go there, yes. I don't recall
3  if I did or not.
4  Q. Wouldn't you do that immediately?
5  A. As we're defining the roles and going through
6  this investigation, it would be something we would want
7  to do, yes.
8  Q. Wouldn't an adequate investigation include you
9  looking up whether or not Troy and Norma were members or
10 managers of a limited liability company?
11 A. Sure.
12 Q. But you didn't do that, did you?
13       MS. GOLIGHTLY: Form.
14       THE WITNESS: I don't recall.
15 Q. BY MR. STROJNIK: Okay.
16       (Discussion off the record.)
17 Q. BY MR. STROJNIK: If you hadn't done that, that
18 would be inadequate in your investigation, would it not?
19 A. Based on the information in this specific case,
20 the information provided by Mr. Callan during the
21 interview that he underwent and at the initial
22 investigation part of all of this, we had no reason to
23 believe they were members or managers, but, again, that
24 was something that we needed to look into based on what
25 they would tell us. If they told us they were, it would

Page 48

1  be something that we would have to evaluate.
2  Q. I thought you mentioned to me earlier that you
3  were actually investigating that, but you were unable to
4  get to a conclusion. Did I misunderstood your testimony?
5  A. I think we're mixing and jumbling it all up.
6  We need to know what Troy and Norma's role was. We've
7  asked to get their statements. We're still investigating
8  that part of it. So overall in general, that's still
9  under investigation.
10 Q. So all the questions about whether they are
11 partners, employees, directors, trustees, authorized
12 representatives, managers, members, or persons with
13 interest in the property, all these questions still have
14 to be answered before you make a decision whether or not
15 to accept or deny the claim?
16 A. It's part of the ongoing investigation, yes.
17 Q. And if you can't talk to Norma or to Troy, we
18 will never know --
19       MS. GOLIGHTLY: Form.
20 Q. BY MR. STROJNIK: -- whether or not --
21       MS. GOLIGHTLY: Sorry, I thought you were
22 done.
23       MR. STROJNIK: I know you're anxious.
24 Q. BY MR. STROJNIK: We will never know, and you
25 will never pay? Is that how this works?

Page 49

1    MS. GOLIGHTLY: Form.
2    THE WITNESS: That is not how this works.
3  We still need to complete an investigation. If we get to
4  a point that we can't speak with Troy and Norma, we will
5  evaluate the information we have, where else we can go,
6  what else we can do with this case. But at this point,
7  that's not the end of the case.
8    Q.  BY MR. STROJNIK: Okay. Let me go to a more
9  general question. A policy of insurance is a contract
10 between the insured and the insurer, correct?
11   A.  Yes.
12   Q.  The purpose of the policy of insurance from the
13 insured's perspective is to avoid a calamity or a
14 calamitous loss that he would have to pay out of pocket,
15 correct?
16   MS. GOLIGHTLY: Form and foundation.
17   THE WITNESS: Yes.
18   Q.  BY MR. STROJNIK: So to avoid that calamitous
19 loss, he goes to an insurance company and says, can you
20 insure me against a potential calamitous loss? And the
21 insurance company says what? We'll do it if you pay us
22 money, correct?
23   MS. GOLIGHTLY: Form.
24   THE WITNESS: Yes.
25   Q.  BY MR. STROJNIK: And then the insured pays the

Page 50

1  money, and the insurance company insures against a loss.
2  Correct?
3    A.  Yes.
4    Q.  And the bargain between the parties is the
5  insured is going to pay the insurance company money to
6  insure against this calamitous loss, correct?
7    A.  Yes.
8    Q.  And the calamitous loss in our case is the loss
9  of equipment, correct?
10   A.  Yes.
11   Q.  Now, the insured paid the premiums, correct?
12   A.  Yes.
13   Q.  The insurance company issued a policy, correct?
14   A.  Yes.
15   Q.  And this bargain between them came into effect,
16 correct?
17   A.  Yes.
18   Q.  And then the insured suffered a loss, correct?
19   A.  Yes.
20   Q.  And the insurance company didn't pay, correct?
21   A.  We've not paid yet in this instance.
22   Q.  Okay. The fact of the matter is you have not
23 paid, correct?
24   A.  Correct.
25   Q.  And what you're saying is we didn't pay because

Page 51

1  we are "investigating" the claim, correct?
2    A.  Yes.
3    Q.  And you testified that even if this
4  investigation takes ten years, that's how long we're not
5  going to pay, correct?
6    MS. GOLIGHTLY: Form.
7    THE WITNESS: Correct.
8    Q.  BY MR. STROJNIK: And we also discussed the
9  fact that the insurance company, your employer,
10 determines what to investigate, correct?
11   A.  Correct.
12   Q.  You can investigate whatever you want, and if
13 the insured person comes to you and says, pay me, huh-uh,
14 we're investigating, correct?
15   MS. GOLIGHTLY: Form.
16   THE WITNESS: It has to be relevant to the
17 matter at hand. It has to be relevant to the terms and
18 conditions of the policy, the exclusions.
19   Q.  BY MR. STROJNIK: Correct.
20   A.  Correct.
21   Q.  What's happened in this case, you've been
22 saying, we're investigating, we're investigating, we're
23 investigating, we're not paying. That's what happened so
24 far?
25   A.  We are investigating. We have not said we are

Page 52

1  not paying. We're investigating. Our investigation is
2  not complete.
3    Q.  We're investigating, we're investigating, we're
4  investigating. It's now a year later. We're still
5  investigating. And we have not paid because we're still
6  investigating. Correct?
7    A.  Correct.
8    Q.  And that caused my client to have to file a
9  lawsuit, correct?
10   MS. GOLIGHTLY: Form.
11   THE WITNESS: That was his choice. We're
12 still investigating, yes.
13   Q.  BY MR. STROJNIK: And he said, that's not the
14 game we played. We agreed that I would pay the premium,
15 you agreed to pay the damage, correct?
16   MS. GOLIGHTLY: Form.
17   THE WITNESS: That's the basic institute of
18 an insurance contract, yes.
19   Q.  BY MR. STROJNIK: Exactly. And, ultimately,
20 you said, yeah, but we didn't really decline the claim or
21 deny the claim. We're just investigating. We're just
22 keeping it open, correct?
23   A.  Just to keep it open, no. We're still
24 investigating the claim. There are still questions about
25 the loss that we have.

Page 53

1  Q.  And you're keeping it open, correct?
2  A.  Correct.
3  Q.  And my client doesn't have the money, does he?
4      MS. GOLIGHTLY: Form.
5      THE WITNESS: Correct.
6  Q.  BY MR. STROJNIK: So he didn't get his part of
7  the bargain, which is, if I suffer a loss, I get the
8  money, did he?
9      MS. GOLIGHTLY: Form.
10     THE WITNESS: At this point, not yet.
11 Q.  BY MR. STROJNIK: Okay. Just looking at it
12 from -- not from an insurance perspective, looking at it,
13 do you see a problem in this case? Just fundamental
14 equitable just the way people think. Just the moral,
15 ethical problem in this case. Do you see that?
16     MS. GOLIGHTLY: Form.
17     Don't answer that. She's not here to
18 testify to what she thinks.
19     MR. STROJNIK: You can only tell her not to
20 answer privileged information.
21     MS. GOLIGHTLY: Not in federal court.
22 Q.  BY MR. STROJNIK: Go ahead and answer.
23     MS. GOLIGHTLY: Don't answer that.
24 Q.  BY MR. STROJNIK: Will you take your attorney's
25 sage advice and refuse to answer my question?

Page 54

1  A.  I will.
2      MR. STROJNIK: Really, in federal court, you
3  can just do that?
4      MS. GOLIGHTLY: Well, it's a 30(b)(6) depo.
5  It's not what her opinions are. It's what the actual
6  facts are on behalf of the company.
7      MR. STROJNIK: Okay. We can go at it a
8  different way.
9  Q.  BY MR. STROJNIK: I'm not asking you from your
10 opinion. I'm asking you for the insurance company's
11 opinion. Looking at the entirety of this case in which
12 the insurance company says, so long as we investigate, we
13 will not admit or deny the claim, even if it takes ten
14 years, do you see anything wrong with that?
15     MS. GOLIGHTLY: Form and foundation.
16     You can answer to the extent you're able to.
17     THE WITNESS: I'm not even sure how to
18 approach the answer other than there are material
19 questions still at issue. As a prudent insurer, I
20 believe that those questions have to be answered before
21 we can issue a payment.
22 Q.  BY MR. STROJNIK: You brought up a new factor.
23 A prudent insurer. Are you aware of any policy term that
24 talks about the prudence of the insurer?
25     MS. GOLIGHTLY: Form.

Page 55

1      THE WITNESS: I do not. As a reputable -- I
2  don't know the right term to use, but someone that is --
3  as an insurance company that is upstanding and looks at
4  the big picture, the facts, and pays claims when the
5  material investigation has been completed.
6  Q.  BY MR. STROJNIK: So when you say upstanding
7  insurance company, are you referring to your employer?
8  A.  We are a pretty good insurance company, yes.
9  Q.  Now, while you are not paying my client his
10 damages of $140,000, is the money set aside in an account
11 somewhere?
12     MS. GOLIGHTLY: Form.
13     THE WITNESS: That would be the adjustor's
14 responsibility if there was a reserve set, if that's what
15 you're asking.
16 Q.  BY MR. STROJNIK: I'm asking something like
17 that. Was a reserve set to the best of your knowledge?
18     MS. GOLIGHTLY: Form.
19     THE WITNESS: I don't handle that part of
20 it. I don't know what he set. I don't know at this time
21 where it is.
22 Q.  BY MR. STROJNIK: Do you know that every claim
23 has a reserve?
24     MS. GOLIGHTLY: Form.
25     THE WITNESS: Every claim at my company?

Page 56

1  Every claim in existence?
2  Q.  BY MR. STROJNIK: Every claim in your company,
3  in your upstanding company.
4  A.  Not being in that department, not being the
5  claims adjustor, I know that reserves are set for claims.
6  I don't know the amounts, the thresholds, the rules of
7  reserving.
8  Q.  Now, when you don't pay a claim because you are
9  investigating, while the investigation is going on, you
10 have the use of the money that would have been paid on a
11 claim if the investigation had not been going on,
12 correct?
13     MS. GOLIGHTLY: Form and foundation. I
14 think that's still outside the scope.
15     THE WITNESS: That's not within my scope of
16 knowledge and business -- my job role. That's outside of
17 my job role.
18 Q.  BY MR. STROJNIK: I understand.
19     (Exhibit 3 was marked.)
20 Q.  BY MR. STROJNIK: Have you ever seen Exhibit
21 No. 3?
22 A.  I was aware of it. I don't know that I
23 actually saw it. I know Michael said a letter had come
24 in.
25 Q.  Did you read it when you saw it?

Page 57

1   MS. GOLIGHTLY: Form.
2       Did you see it?
3       THE WITNESS: I'm looking at it. I don't
4   recall if I actually just knew it came in or if I
5   actually read it. At this point I'm not sure. I was
6   aware of it.
7   Q.  BY MR. STROJNIK: How were you aware of it?
8   A.  Mr. Scotko told me he received a letter from
9   you.
10  Q.  Did he show it to you, do you recall?
11  A.  We're not in the same office. He's in New York
12  and I'm in Colorado. So, again, I don't recall him
13  specifically showing it to me.
14  Q.  Does he have an email address?
15  A.  Yes.
16  Q.  Do you have an email address?
17  A.  Yes.
18  Q.  You know this was sent by email?
19  A.  I see it was sent by email.
20  Q.  Did he forward it to you?
21  A.  I don't recall off the top of my head.
22  Q.  Did you have a discussion with him about this
23  letter?
24  A.  I believe he asked where we were with the
25  investigation and what else we had left to do at that

Page 58

1   point. That he had gotten a letter from an attorney on
2   the case.
3   Q.  And what did you tell him?
4   A.  I'd have to look at where we were in the
5   investigation at this specific time. I believe we were
6   still either having or just recently contacted or still
7   trying to contact Norma and Troy. I don't have the exact
8   dates down on when I learned about this letter and when
9   we spoke.
10  Q.  So do you recall what you told him?
11  A.  What I told Michael?
12  Q.  Yes.
13  A.  I just knew that we still had active
14  investigation going on trying to determine where Troy and
15  Norma were. I'd have to look at the actual time frame to
16  see where we were with what else investigation we still
17  had going on because I know we still had active
18  investigation going on.
19  Q.  Does the insurance company have any policies or
20  procedures on how to investigate insurance claims?
21  A.  I believe our claims manual has that. I know
22  that we have -- I can't think of the right word. The
23  training -- the claims processes, yeah.
24  Q.  There is stuff in writing that tells you how to
25  process a claim, correct?

Page 59

1   A.  I believe so. I'm not 100 percent sure on the
2   claims handling side of that.
3   Q.  Are you aware of any policies that discuss how
4   to investigate the claim?
5   A.  Every adjustor and investigator goes through
6   training, and we also attend seminars and continuing
7   education, as you well know. So yes.
8   Q.  Are there any policies or manuals or other
9   written documents that provide guidance to you of how to
10  investigate a claim?
11  A.  The claim handling guidelines is what I believe
12  we have.
13  Q.  What does this document look like, claim
14  handling guidelines?
15  A.  It's a -- I don't even know how many pages. It
16  talks about receiving -- investigating claims. It talks
17  about handling claims. It talks about processes and
18  procedures for that.
19  Q.  What does it look like?
20  A.  It's a pdf file. We don't have the big open
21  binders anymore.
22  Q.  Do you know how big the file is?
23  A.  I don't.
24  Q.  Is it more than ten pages?
25  A.  Probably.

Page 60

1   Q.  Is it 100 pages?
2   A.  Probably. I don't know.
3   Q.  Does it have a search function?
4   A.  I don't know.
5   Q.  Where you go, please find "we can't talk to
6   Norma, what do we do"? Does it have anything like that?
7   A.  I don't know. It may.
8       MR. STROJNIK: Can you produce that, please.
9       MS. GOLIGHTLY: (Nod in the affirmative.)
10      MR. STROJNIK: Thanks.
11  Q.  BY MR. STROJNIK: The reason why I showed you
12  Exhibit No. 3 is I wanted to show you where this language
13  about immediately conducting adequate investigation came
14  from. In the paragraph below the first paragraph, I
15  quote from a case.
16  A.  Yes.
17  Q.  Go ahead and read that.
18  A.  Okay.
19  Q.  You read the whole thing?
20  A.  Yes.
21  Q.  You've testified that you have in this case
22  conducted an immediate investigation?
23  A.  As we gain more information and identify other
24  issues that may need to be investigated, we have
25  continued our immediate investigation as the facts

Page 61

1 presented.
2  Q. And you claim that you have conducted an
3 adequate investigation?
4  A. Yes.
5  Q. Well, if you conducted an adequate
6 investigation, we would know whether to accept or deny
7 the claim, wouldn't we?
8        MS. GOLIGHTLY: Form.
9        THE WITNESS: We are still in the process of
10 completing that investigation.
11  Q. BY MR. STROJNIK: Okay. So this immediacy
12 hasn't occurred yet. You're still investigating to make
13 the investigation adequate. The investigation is not
14 adequate yet, is it?
15        MS. GOLIGHTLY: Form.
16        THE WITNESS: There's still information that
17 we need to gather, correct.
18  Q. BY MR. STROJNIK: Would you agree with me that
19 your investigation up to today is not yet adequate?
20        MS. GOLIGHTLY: Form.
21        THE WITNESS: It's not completed. Right, we
22 don't have the information that's material to the
23 investigation. We don't have those facts.
24  Q. BY MR. STROJNIK: I'm asking you if it's
25 adequate because I'm going to take your answer, and I'll

Page 62

1 show it to the judge on a motion for summary judgment.
2 So my question is this: Has your investigation been
3 adequate?
4  A. What we have done --
5  Q. Just answer yes or no if it's adequate or
6 hasn't been adequate.
7  A. Yes.
8  Q. And it's been immediate?
9  A. In terms of investigating and replies and more
10 information and evaluation of the information we've got,
11 yes. We have acted immediately when we got new
12 information to conduct further investigation.
13  Q. And the investigation so far has not shown that
14 this is an illegitimate claim, has it?
15        MS. GOLIGHTLY: Form and foundation. That's
16 coverage related.
17        THE WITNESS: My investigation has been
18 presented to the management, to Mr. Scotko, to his
19 manager, and there's still information we need to
20 complete it.
21  Q. BY MR. STROJNIK: Okay. Do you have any
22 evidence to indicate that the claim made by Arcade is not
23 a legitimate claim?
24  A. The last information we obtained through our
25 investigation from Norma -- or actually through Troy is

Page 63

1 still being investigated because it was said that they
2 had received information from Mr. Callan to move the
3 machines to the storage unit. That is not consistent
4 with what we've learned from Mr. Callan during the
5 statement, so we're still investigating that aspect of
6 it.
7  Q. So as of today's date, which is October 23rd,
8 2014, you have no evidence to show that the claim made by
9 Arcade is not legitimate. Correct or incorrect?
10        MS. GOLIGHTLY: Form and foundation.
11        THE WITNESS: The information we've recently
12 learned from Troy was that they were asked to move the
13 machines by Mr. Callan, which is then in dispute with
14 what Mr. Callan has said how the loss occurred. So...
15  Q. BY MR. STROJNIK: Let's you and I make a deal.
16 I'm going to ask you a yes-or-no question. And you will
17 try to answer the question with yes or no. Can we make
18 that deal?
19  A. Sure.
20        MS. GOLIGHTLY: You don't have to answer a
21 question yes or no. You can answer it however you feel
22 necessary.
23        MR. STROJNIK: Too late. She made a deal
24 already.
25        THE WITNESS: I said I would try.

Page 64

1        MR. STROJNIK: Can you read my last question
2 back.
3        (The requested portion of the record was
4 read by the reporter.)
5        THE WITNESS: The phrasing is still a little
6 difficult on that one. I have no evidence to show that
7 the claim is legitimate or not legitimate. I mean, we're
8 still at a crossroads on that right now because we have
9 new information that's come forth that was inconsistent
10 with what was reported.
11  Q. BY MR. STROJNIK: So you have no evidence that
12 it was legitimate or illegitimate, we just don't know,
13 correct?
14        MS. GOLIGHTLY: Form.
15        THE WITNESS: Correct. We're still
16 investigating.
17  Q. BY MR. STROJNIK: We don't know.
18  A. Yes.
19  Q. So if we don't know, that means we don't know
20 if it is a legitimate claim, correct?
21  A. Correct.
22  Q. And we don't know if it's an illegitimate
23 claim, correct?
24  A. Correct.
25  Q. The Supreme Court judge went on and said that

Page 65

1  the insurance company should not force an insured to go
2  through needless adversarial hoops to achieve its rights
3  under the policy. Do you know what the reference to that
4  is? It's lawsuits, right?
5       MS. GOLIGHTLY: Form and foundation.
6  Q.  BY MR. STROJNIK: The judge said, don't make
7  insureds file lawsuits against insurance companies. Just
8  pay legitimate claims. Isn't that what he said?
9       MS. GOLIGHTLY: Form and foundation.
10      THE WITNESS: If that's how you're
11  interpreting that, okay.
12 Q.  BY MR. STROJNIK: How do you read it?
13 A.  I'm reading it for the first time. If that's
14  your understanding, okay.
15      MR. STROJNIK: Well, we have beaten this
16  horse to death. We're done.
17      You've been very kind. Thank you for your
18  time. I understand the difficulty in answering some of
19  the questions.
20      THE WITNESS: Thank you. I appreciate your
21  time as well.
22      MS. GOLIGHTLY: We'll read and sign.
23      (The deposition concluded at 12:19 p.m.)
24
25

Page 66

1                    SIGNATURE PAGE
2       I, DENISE LUPEAR, a deponent exercising my right
to read and sign my deposition taken on October 23, 2014,
3  place my signature hereon and make the following changes
on this _____ day of _____, 2014.
4
       (IF THERE ARE NO CHANGES, WRITE "NONE.")
5
6                         _____
                              DENISE LUPEAR
7
8  PAGE  LINE  READS      CHANGE TO         REASON
9   ___   ___  _____
10  ___   ___  _____
11  ___   ___  _____
12  ___   ___  _____
13  ___   ___  _____
14  ___   ___  _____
15  ___   ___  _____
16  ___   ___  _____
17  ___   ___  _____
18  ___   ___  _____
19  ___   ___  _____
20  ___   ___  _____
21  ___   ___  _____
22  ___   ___  _____
23  ___   ___  _____
24  ___   ___  _____
25  ___   ___  _____

Page 67

1  STATE OF ARIZONA   )
2  COUNTY OF MARICOPA )
3
4       I, CAROLYN T. SULLIVAN, a Certified
5  Reporter, Certificate No. 50528, in the State of Arizona,
6  do hereby certify that the foregoing witness was duly
7  sworn to tell the whole truth; that the foregoing pages
8  constitute a full, true, and accurate transcript of all
9  proceedings had in the foregoing matter, all done to the
10 best of my skill and ability. Pursuant to request,
11 notification was provided that the deposition is
12 available for review and signature.
13
14      I FURTHER CERTIFY that I am not related to
15 nor employed by any of the parties hereto, and have no
16 interest in the outcome.
17
18      WITNESS my hand this 5th day of November,
19 2014.
20
                              *Carolyn Sullivan* (signature)
21                            _____
                              Carolyn T. Sullivan, RPR
22                            Arizona Certified
                              Reporter No. 50528
23
24
25