**EXHIBIT 1**

# Arcade Entertainment

## v.

## AGCS Marine Insurance Company

## 18532-00001

## Witness: Alexander Perry Callan

### DATE: 11/5/13

### [Note: Names are spelled phonetically]

| | |
|---|---|
| Interviewer: | Okay, we've just started the recorded statement. This a recorded statement taken by myself, Brent Meyers. I am working for and on behalf of Alliance Global Corporation and, uh, I am speaking today with, could I have your full name, sir? |
| Callan: | Alexander Perry Callan. |
| Interviewer: | That's P E R R Y? |
| Callan: | Correct. |
| Interviewer: | Alexander, regular spell name? |
| Callan: | Correct. |
| Interviewer: | Great. Today's date is the 5th of November, 2013. Local time right now is 10:18 a.m. You do understand that we are recording this? |
| Callan: | Yes. |
| Interviewer: | And do I have your permission to do so? |
| Callan: | Yes. |
| Interviewer: | Are you currently being represented by an attorney in this matter? |
| Callan: | No. |
| Interviewer: | Okay. So it's Alexander Perry Callan, and how do you spell your last name? |
| Callan: | C A L L A N. |

1

| | |
|---|---|
| Callan: | Well the second page has the serial numbers. |
| Interviewer: | Oh, okay. Great then. So these are the figures with the serial numbers and the number of machines for each? |
| Callan: | Yes. |
| Interviewer: | Well if you have more in-depth sales figures as well, can you print it out? |
| Callan: | Yeah. |
| Interviewer: | Okay so that's what Omar said. You went the Texas Game Room and what did you find out there? |
| Callan: | Same thing. |
| Interviewer: | Who did you speak to? |
| Callan: | Kevin and I don't know Kevin's last name. Phone number for Kevin 214-293-5993. |
| Interviewer: | Okay. When you spoke with Kevin, what did he tell you? |
| Callan: | He said that they came and picked them up. |
| Interviewer: | So was your impression then that it was the same individuals that had always come? |
| Callan: | Yes. |
| Interviewer: | And when I say they, your only employee is Norma so what did that mean to you? |
| Callan: | Norma came and picked them up. |
| Interviewer: | Okay, but he is using plural. |
| Callan: | Well she's a woman, I'm sure she had help. I mean the machines weigh 100 pounds or so each. Even with the dolly they are difficult to get into a U-Haul. |
| Interviewer: | Okay. Um, and then ah let's see here, with the H1 Smoke Shop, who did you speak to there? |
| Callan: | That one was closed so there was nobody. And it was, you know, closed and emptied out and... |
| Interviewer: | Vacated? |

| | |
|---|---|
| Callan: | Yeah. |
| Interviewer: | Okay. And uh was this before or after you went to the storage unit? |
| Callan: | After. |
| Interviewer: | Okay. So you went to the storage unit first and saw there was nothing there? |
| Callan: | Yeah. I went to the storage unit to get my tools. |
| Interviewer: | And why were you going to get your tools? |
| Callan: | You know, so I wanted to, if there was anything that needed to be taken apart or any of that kind of stuff, I needed them. |
| Interviewer: | Okay. So you went there and you saw completely empty? |
| Callan: | I mean there was junk in there. |
| Interviewer: | Was the lock broken? |
| Callan: | No, the lock wasn't broken. The lock was on. |
| Interviewer: | I thought I had seen something here where you said the lock was broken, but maybe I read it wrong. |
| Callan: | Maybe the lock wasn't broken. |
| Interviewer: | Yeah, maybe that was it then. Okay I just want to make sure the lock wasn't broken. Ah, now did you talk to the people at the U-Haul location as far as what they may have seen, heard, had videoed or anything? |
| Callan: | I did not. |
| Interviewer: | Okay, why is that? |
| Callan: | Because I was, you know, how would the lock not be broken and there's nothing in it. I mean I don't think that there's much, I mean what do I need to see to confirm what I already know. |
| Interviewer: | Well, I mean it would imagine that it would be certainly helpful for police. I mean did you want to prosecute Norma if she was the one who did all this? |
| Callan: | I wanted to have nothing to do with her again really. I mean I don't really know what prosecuting Norma is going to do for me or for her, but I think I already know what I know. The most benefit that |

40

| | |
|---|---|
| | I'm going to get is not doing business with her again. You know, whether she's in jail or just not my employee. |
| Interviewer: | Okay, so when you get to the storage unit, you say the lock was still there and locked? |
| Callan: | Um huh. |
| Interviewer: | And of course she had the key? |
| Callan: | Yeah. |
| Interviewer: | Did you report any of this to the police? |
| Callan: | Yes. |
| Interviewer: | Okay, when did you call the police? Let me rephrase that. When did you call the police in relation to the places that you visited? In other words, did you call the police when you saw the storage unit was empties or did you call the police after you went to the various businesses? |
| Callan: | I called the police after I went to all of the locations and then I filed a report a little bit later when I got back here. So I would have called the police on the 26th. |
| Interviewer: | Okay. |
| Callan: | I have 15 minutes left for this right now. Can we reschedule to complete it at another time? |
| Interviewer: | Possibly. Because obviously this is just getting started. |
| Callan: | Yeah. |
| Interviewer: | And it is very involved so that's why. Would you have time later this afternoon or tomorrow, or what would work for you? |
| Callan: | It would have to be like next Friday would probably be the earliest I can. I'm going to Paris tomorrow, or actually Thursday. |
| Interviewer: | Wow. Okay. After all this happened did you try to contact Norma? |
| Callan: | I did. |
| Interviewer: | Okay and what was the result of that? |
| Callan: | She basically said… |

41

**EXHIBIT 2**

UNITED STATES DISTRICT

COURT OF ARIZONA

Arcade Entertainment, LLC,        )
                                  )
              Plaintiff,          )
                                  )
      vs.                         ) No. CV 2014-003380
                                  )
AGCS Marine Insurance Company,    )
                                  )
              Defendant.          )
                                  )

DEPOSITION OF ALEX CALLAN

Phoenix, Arizona
October 23, 2014
9:16 a.m.

PREPARED BY:

Rosina Seymour, RPR
Certified Reporter
Certificate No. 50212

SEYMOUR REPORTING SERVICES
Registered Reporting Firm R1000
137 East Elliot Road, #2473
Gilbert, Arizona  85299
(P)602.258.5800
(F)888.881.5440

1  you tell Norma and Troy that you were coming down
2  there?
3      A.   No.
4      Q.   Why not?
5      A.   I wanted to have control of everything first.
6      Q.   Why?
7      A.   Because I didn't know what the problem was at
8  that point, and so the wisest choice is to get your
9  assets first, before you start kicking up dust.
10     Q.   Okay.  Did you have any -- did you suspect
11 that Norma and Troy might be mishandling the machines?
12     A.   I suspected everything, so all of that came
13 into mind.  I suspected that, you know, the machines
14 were all broken.  I suspected that somebody was
15 stealing money out of my machines at the location.  You
16 know, every thought crossed my mind.
17     Q.   Okay.  So you get down there and you go to
18 Oasis.  Oasis has the machines, and I -- I'm sorry.
19 Did you take them with you as soon as you got to Oasis?
20     A.   Yes.
21     Q.   Okay.  And so you put them in the U-Haul truck
22 that you rented; correct?
23     A.   Yes.
24     Q.   Then did you take the U-Haul truck around to
25 all these other locations?

1   A.   Yes.
2   Q.   And location-by-location you started to
3   realize that there's no machines at any of them?
4   A.   Yes.
5   Q.   And then what did you do when you realized
6   that there were no machines at the locations where they
7   were supposed to be?
8   A.   I called Norma.
9   Q.   And what did Norma say?
10  A.   She basically said, "I don't have your
11  machines anymore. I'm really sorry. I don't have
12  them."
13  Q.   That was it?
14  A.   Basically, that was it. Yeah.
15  Q.   Did you ask her what happened to the machines?
16  A.   She -- I asked her what happened to the
17  machines, and she said, you know, "I don't have them
18  anymore. I can't get them back for you." That's it.
19       She was very apologetic and very firm
20  about the fact that she couldn't do anything about it.
21  And didn't really have any explanation for it.
22  Q.   Okay. Did you talk to Troy about where the
23  machines were?
24  A.   A little bit.
25  Q.   What did Troy say?

1   A.   About the same.
2   Q.   That they just -- they have absolutely no idea
3   where the machines went?
4   A.   I think they had an idea where the machines
5   went, but they didn't want to talk to me about it.
6   Q.   What do you mean by that?
7   A.   I think that they, you know, the machines got
8   broken or the machines got taken from them or they --
9   you know, they put them in the wrong spot, and they
10  didn't know how to tell me.
11  Q.   Okay.  What do you mean by "put them in the
12  wrong spot"?
13  A.   Put them in a location where somebody took
14  them or put them in -- you know, left them in a place
15  that somebody took them from or they no longer have
16  access to or something to that respect.  You know, I
17  didn't feel like they -- I didn't feel like Norma and
18  Troy were bad people at all.  And I just think that
19  they got -- they may have gotten themselves into a
20  scenario that they couldn't get out of.  That's why
21  communication stopped.  That's why money stopped coming
22  in and why they didn't really have anything to tell me.
23  Q.   At any point, did you suspect that they had
24  something to do with the disappearance of the machines?
25  A.   Obviously.  Of course, I would have that

1  suspicion, you know, but, like I said, I suspected
2  everything. I mean, the machines were gone.
3      Q.   Okay. Well, once you got -- so after you go
4  to all of these places and the machines are all gone,
5  did you go back to the storage unit?
6      A.   Yes.
7      Q.   And did you drop off the five machines that
8  you got at Oasis?
9      A.   Yes.
10     Q.   In the storage unit that was empty?
11     A.   Initially, I did. And then I got a new
12 storage unit there and, you know, moved it to another
13 one in the same facility so that those wouldn't
14 disappear as well.
15     Q.   Okay. So once you got back to the storage
16 unit, was it your impression that someone had stolen
17 the machines out of the storage unit?
18     A.   Obviously, the machines weren't there, so the
19 answer is yes. But I don't know if they were stolen
20 from the storage unit itself or stolen from another
21 location.
22     Q.   So you didn't have any concerns placing the
23 machines at the same storage location and just
24 switching units?
25     A.   I didn't have any concern about that at all.

```
 1
 2
 3
 4
 5
 6
 7         I, the undersigned, say that I have read
 8   the foregoing transcript of testimony taken October 23,
 9   2014, and I declare, under penalty of perjury, that the
10   foregoing is a true and correct transcript of my
11   testimony contained therein.
12
13         EXECUTED this _____ day of
14   _____, 2014.
15
16
17                                  _____
18                                        ALEX CALLAN
19
20
21
22
23
24
25
```

1  STATE OF ARIZONA        )
                           ) ss.
2  COUNTY OF MARICOPA      )

3

4        BE IT KNOWN that the foregoing proceedings were taken before me, ROSINA SEYMOUR, Certified
5  Reporter No. 50212, that the witness before testifying was duly sworn by me to testify to the whole truth;
6  that the foregoing pages are a full, true and accurate record of the proceedings, all done to the best of my
7  skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print
8  under my direction.

9        [X] Review and signature was requested.

10       [ ] Review and signature was waived.

11       [ ] Review and signature not required.

12       I CERTIFY that I am in no way related to any of the parties thereto nor am I in any way
13  interested in the outcome hereof.

14       I FURTHER CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206.
15  DATED at Gilbert, Arizona, this 5th day of November, 2014.

16       *signature*

17       _____
         Rosina Seymour, RPR
18       Certified Reporter
         Certificate No. 50212

19

20            *   *   *   *

21

22       I CERTIFY that SEYMOUR REPORTING SERVICES has complied with the ethical obligations set forth in
23  ACJA 7-206.

         *signature*

24       _____
         Rosina Seymour, RPR, Owner
25       Seymour Reporting Services
         Arizona RRF No. R1000